982 A.2d 868

WINCOPIA FARM, LP

v.

Martin L. GOOZMAN, et al.

No. 1297, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Oct. 29, 2009.

Cynthia E. Young, Annapolis, for Appellant.

Jeffrey W. Bernstein (Goozman, Bernstein & Markuski, on brief), Laurel, for Appellee.

Panel: EYLER, DEBORAH S., ZARNOCH, MATRICCIANI, JJ.

EYLER, DEBORAH S., J.

Wincopia Farms, LP ("WFLP"), the appellant, challenges a February 13, 2008 decision by the Circuit Court for Howard County denying its motion to stay foreclosure sale. The appellees are Martin L. Goozman and Jeffrey W. Bernstein,

the Substitute Trustees on a deed of trust on 124.17 acres of land in Howard County ("The Property").

As framed by WFLP, the sole question presented is,

Where a mortgagor is subjected to fraudulent securities violations, in order to obtain the loan, is the mortgagor or guarantor required to post bond or pay any amount due in order to satisfy the statutory requirements of Rule 14–209 in order to obtain an injunction?

Stripped of argument, the question is whether the circuit court abused its discretion by denying WFLP's motion to stay foreclosure sale. We answer that question in the negative and therefore shall affirm the court's order.

## FACTS AND PROCEEDINGS

At the relevant times in this case, the Property was owned by WFLP. Ruth Roberts Hearn is the General Partner in WFLP. The Property is a farm that has been owned by members of her family for at least 50 years.[1]

Wincopia Farms, Inc. ("WFI"), is a corporate entity separate from but related to WFLP. At all relevant times, Harry Hearn was President of WFI.[2]

On July 18, 2002, WFI borrowed $4,500,000 from G & G, LLC ("G & G"), a Virginia limited liability company, as evidenced by a promissory note ("Initial Note"). WFLP guaranteed the loan and granted an Indemnity Deed of Trust ("IDOT") on the Property as security. The Initial Note was for a one-year term, at an interest rate of 12%.

The primary purpose for the loan was to enable WFI to pay off its debt to United Bank. That debt was secured by the Property and was in default. A secondary purpose of the loan

---

1.  WFLP stated in numerous filings in the trial court that the farm had been in the family since the Civil War; in its brief, it states that the Property has been owned by members of the Hearn family "at least since June, 29, 1959."

2.  The record does not reveal whether Harry Hearn is related to Ruth Hearn and, if so, how.

was for WFI to obtain operating capital for the nursery and greenhouse operation it maintained on the Property.

The $4,500,000 loan funds secured by the Initial Note were disbursed as follows:

(1) $2,910,039.60 to pay-off of debt owed by WFI to United Bank;

(2) $737,777.16 to WFI

(3) $180,000 in prepaid interest on $1.5 million of the loan;

(4) $360,000 to an "interest reserve account"; and

(5) the balance to closing costs and other transaction fees.

According to the loan documents, the $360,000 "interest reserve account" was a "capital contribution" in G & G. That sum was to be invested by G & G at an 8% return. The $360,000 and the 8% interest it would generate were to be the "dedicated source" for payment of the interest on the $3 million remainder of the loan (above the $1.5 million, on which interest had been prepaid). At the end of the one-year term of the loan, the full amount of the interest reserve account was to have been paid to G & G as interest on the loan.

On July 18, 2003, the parties entered into a modification and extension of the Initial Note ("First Loan Modification") by which the loan was extended for a term of one year (until August 1, 2004) at an increased principal sum of $5,400,000, that is, $900,000 above the principal amount on the Initial Note. Like the Initial Note, the promissory note for the First Loan Modification created an "interest reserve account." That account for the First Loan Modification amounted to $884,171.79. It was taken from the additional principal, and designated as a capital contribution or membership interest held by WFI in G & G. As with the Initial Note, the sum in the "interest reserve account" would earn 8% interest; and the sum and interest earned on it together would be dedicated to paying the monthly interest on the First Loan Modification.

In the following three years, the parties entered into three more loan modifications: 1) the Second Loan Modification on August 24, 2004, which increased the principal amount of the

loan from $5,400,000 to $7,000,000; 2) the Third Loan Modification on September 1, 2005, which increased the principal amount of the loan from $7,000,000 to $9,400,000; and 3) the Fourth Loan Modification on August 1, 2006, which increased the principal loan amount by $400,000, to $9,840,000. Each of these loan modifications was structured to include an "interest reserve account." Unlike the interest reserve accounts in the Initial Note and the note on the First Loan Modification, however, those accounts in the subsequent loan modification notes took the form of a line of credit in an amount equal to the total yearly interest due on the loan. Each month, WFI would draw against the line of credit to pay the interest due on the note, and the principal balance due on the loan would increase by the amount of the draw. Like the first two loans, the last three were secured by an Indemnity Deed of Trust on the Property.

The $1,600,000 disbursement for the Second Loan Modification was restricted "*solely and exclusively* to pay interest due and payable on the Existing Note," except that $250,000 of the loan proceeds were available to WFI for costs relating to development of the Property upon approval by the Lender of documentation of development plans and/or contracts. No development plans ever were submitted for approval, however; accordingly, the $250,000 never was disbursed to WFI.

The Third Loan Modification sum was disbursed $450,000 to WFI on August 25, 2005; $858,900 to WFI on September 1, 2005 (the date of closing); $180,000 in payment of a judgment against WFLP that was a lien on the property; $11,000 in closing costs; $75,000 in attorneys' fees; and $825,100 in the form of the line of credit for payment of interest.

Finally, the $400,000 disbursement for the Fourth Loan Modification was restricted in use solely for payment of 1) interest due on the then existing note (*i.e.* the Third Loan Modification note), 2) legal fees incurred by the Lender in connection with the Fourth Loan Modification, and 3) other costs associated with the Fourth Loan Modification as ap-

proved by the Lender. The maturity date of the loan was extended to January 1, 2007.

For all the loans, the promissory notes were signed by Harry Hearn, on behalf of WFI, with Ruth Hearn signing as General Partner of WFLP, in guarantee of the loan amounts.

In December 2006, WFI defaulted on the Fourth Loan Modification. On May 11, 2007, in the Circuit Court for Howard County, the appellees filed an order to docket for foreclosure of Indemnity Deed of Trust. The appellees alleged that the loan was in default with $10,944,213.31 due, and a *per diem* interest rate of $6,111.73.

On May 17, 2007, appellee Goozman filed an affidavit, pursuant to Md.Code (2003 Repl.Vol.), subsection 7–105(a) of the Real Property Article ("RP"), attaching a notice that foreclosure proceedings against the Property had commenced and that a foreclosure sale would be held. Goozman filed a second affidavit on June 18, 2007, pursuant to RP subsections 7–105(b) and (c) and Maryland Rule 14–206(b), attaching an advertisement for the sale of the Property to take place on June 28, 2007.

On June 28, 2007, the day the foreclosure sale was scheduled to take place, WFLP filed in the United States Bankruptcy Court in Maryland a petition for bankruptcy under Chapter 11 of the Bankruptcy Code. The filing of the petition triggered the automatic stay in bankruptcy, under section 362 of that code, and thus suspended the foreclosure sale.

Within the bankruptcy proceeding, G & G moved to lift the automatic stay so it could pursue the foreclosure sale of the Property. The bankruptcy court ordered WFLP to pay G & G $134,152 in "cash or cash equivalent" by noon December 30, 2007, and on the 30th day of each month thereafter, "said amount being equivalent to the monthly interest accruing on indebtedness owed by [WFLP] to [G & G] at the contract (non-default) rate[.]" The court further ordered that, if WFLP should fail to pay that sum to G & G as due, without properly curing the failure, "the automatic stay shall, without further hearing before or order of this Court, be deemed to be

immediately lifted in order to allow [G & G] to exercise its rights and remedies against the Property[.]"

On December 30, 2007, WFLP failed to make the first payment required by the bankruptcy court's order. The next day, the automatic stay was lifted. On January 24, 2008, the appellees rescheduled the foreclosure sale for February 14, 2008, at 8:45 a.m. On January 28, 2008, Goozman filed an affidavit under RP subsections 7–105(b) and (c) and Rule 14–206(b).

On February 13, 2008, the day before the scheduled foreclosure sale, WFLP filed a "Motion for Stay of Foreclosure Pursuant to Maryland Rule 14–209(B)(1)," supporting memorandum of law, and affidavit of Ruth Hearn. Also attached as exhibits were a State of Virginia computer printout entitled "Case Summary for Case Number: SEC–2008–00007"; a "Rule to Show Cause" issued by the Division of Securities and Retail Franchising Division of the Virginia State Corporation Commission in the matter of State Corporation Commission of Virginia versus G & G, LLC, and D. Trent Gourley; the HUD settlement sheets, promissory notes, and Loan Modification and Extension Agreements for the initial loan through the fourth modification of the loan; a statement by G & G dated August 20, 2008, showing that $9,220,880.36 was owed on the loan; and a copy of a "Letter of Commitment" from an outfit called "Divine Development."

Rule 14–209 provides at subsection (b):

**Injunction to Stay Foreclosure.**

(1) *Motion.* The debtor, any party to the lien instrument, or any person who claims under the debtor a right to or interest in the property that is subordinate to the lien being foreclosed, may file a motion for an injunction to stay any sale or any proceedings after a sale under these rules. The motion shall not be granted unless the motion is supported by affidavit as to all facts asserted and contains: (1) a statement as to whether the moving party admits any amount of the debt to be due and payable as of the date the motion is filed, (2) if an amount is admitted, a statement

that the moving party has paid the amount into court with the filing of the motion, and (3) a detailed statement of facts, showing that: (A) the debt and all interest due thereon have been fully paid, or (B) there is no default, or (C) fraud was used by the secured party, or with the secured party's knowledge, in obtaining the lien.

In its memorandum of law, WFLP asserted that the "membership interests" that served as vehicles for the interest reserve accounts (in the first two loan documents) were investment contracts constituting securities under the Federal Securities Acts of 1933 and 1934, 15 U.S.C. section 77a. *et seq.* and 15 U.S.C. section 78a. *et seq.*, and the Maryland Securities Act, Md.Code (2007 Repl.Vol.) section 11–101 *et seq.* of the Corporations and Associations Article, and that the State of Virginia was currently investigating a claim against G & G that such a "membership interest" is a security that must be registered and only may be sold in compliance with the applicable securities laws. It argued that Ruth Roberts Hearn, and apparently Harry Hearn as well, had been compelled to purchase the membership interests, and that the potential illegality of the membership interests meant that no sums were currently owed on any of the loans to G & G. It further asserted that it would prevail on its securities claims against G & G, although it did not reference any pending securities claim. It alleged that G & G had engaged in fraud, negligence, and breach of fiduciary duty toward WFI/WFLP in extending the loans; and that the irreparable harm, likelihood of success on the merits, balance of hardship, and public interest factors for granting injunctions weighed in favor of staying the foreclosure sale. It also alleged that WFLP had received a February 12, 2008 "binding commitment letter" from Divine Development, another lender, for "at least" $18.5 million dollars, which was more than the sum G & G claimed was owed and, therefore, if money in fact was owed to G & G, it could pay off the debt.

The supporting affidavit of Ruth Roberts Hearn alleged that WFI had been "forced" to fund G & G by purchase of the membership interests that were parts of the loans, without

any facts to support the allegation. Her allegations said nothing about Harry Hearn, who actually signed the notes on behalf of WFI. It also alleged that the amount G & G was claiming was owed to it was not calculated correctly.

That same day, the court issued an order staying the foreclosure sale until 3:00 p.m. on February 14, 2008.

On February 14, 2008, at 8:45 a.m., the appellees filed an "Opposition to Motion for Stay of Foreclosure." Among other things, they argued that WFLP had not complied with Rule 14–209(b) and therefore could not obtain a stay of the foreclosure sale. The appellees pointed out that Ruth Roberts Hearn did not assert in her affidavit that any portion of the debt in question was not due and payable or that the alleged fraud on the part of G & G had any connection at all to the recording of the lien on the Property. They also pointed out that WFLP had not paid the amount of the debt into the court registry upon filing the motion; and that the Divine Development letter of February 12, 2008, was not tantamount to doing so.

The opposition was supported by an affidavit by Demetris Voudouris, in-house counsel for G & G. He asserted that G & G is cooperating with the investigation being carried out by the Virginia State Corporation Commission. The opposition also was supported by filings in the bankruptcy court that showed, according to the appellees, that there was no justification for WFLP to have waited until the eleventh hour to file its motion for stay.

The court held an emergency hearing on the pending motion and opposition prior to the afternoon time for the sale. Ultimately, the court denied the stay motion and allowed the foreclosure sale to proceed. The court made a legal finding that Rule 14–209(b) "is a self-contained mechanism for injunctions related to foreclosure sales," so that Rule 15–503 does not apply and the court does not have authority to establish a bond amount that is less than that required by Rule 14–209.

The court then found as a fact that the evidence submitted on the motion established that the debt secured by the IDOT

on the Property was owed by WFI/WFLP to G & G; and that the February 12, 2008 letter from Divine Development was "not an acceptable replacement for that part of [Rule 14–209(b)] that requires paying money into the [c]ourt," both because the money is offered conditionally and therefore it is not established that it constitutes an $18 million reserve and there is no means for the court to bind the purported lender (Divine Development) to its promise.

The foreclosure sale was held on the afternoon of February 14, 2008, and G & G purchased the Property for $12,500,000. Thereafter, WFLP made a number of unsuccessful challenges to the sale and its ratification by the court. Those issues are not before this Court on appeal. The sole issue is whether there was error or an abuse of discretion by the court in denying the motion to stay foreclosure sale under Rule 14–209(b).

### DISCUSSION

"The grant or denial of an injunction lies within the sound discretion of the trial court, and on appeal, we review the trial court's decision for an abuse of discretion." *Jones v. Rosenberg,* 178 Md.App. 54, 65, 940 A.2d 1109 (2008). We review the trial court's legal conclusions, however, *de novo. See Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.,* 169 Md.App. 137, 145, 899 A.2d 956 (2006).

WFLP contends that, under the terms of the Initial Note and the First Loan Modification, it was obligated to purchase membership interests in G & G in violation of the Maryland Securities Act. Because the membership interests constituted fraudulent securities transactions according to WFLP, the IDOT was obtained by fraud. It further argues that a *prima facie* showing of fraud satisfies Rule 14–209(b)(3)(C). Even if WFLP technically was in default, WFLP posits that the alleged fraud vitiated the need to pay a bond in the amount of the debt into the court registry under the terms of Rule 14–209(b). Accordingly, the trial court erred or abused its discretion in denying the motion to stay foreclosure on this basis.

G & G responds that, even assuming *arguendo* that the IDOT was obtained by fraud, WFLP failed to comply with Rule 14–209(b)(1). This is so because the affidavit attached to the motion to stay did not include a statement admitting or denying whether the debt was due and payable and WFLP did not pay the amount due and payable into the court upon filing the motion. G & G also argues that WFLP failed to make a showing that the membership interests were fraudulent securities transactions. Accordingly, the motion was properly denied.[3]

■ This Court agrees that WFLP failed to comply with Rule 14–209(b) and that the trial court did not abuse its discretion in denying the motion to stay. A review of Ruth Roberts Hearn's affidavit attached to the motion to stay reveals a variety of allegations of misrepresentations and/or fraud relating to the membership interests, discrepancies on the HUD–1 forms, and the amount of interest that G & G collected. Strikingly absent, however, is any averment that WFLP does not owe any monies under the IDOT. Hearn does state that WFLP had received a binding commitment letter for $18,500,000, "which monies could be used to satisfy any of the Hearns['] obligations to G & G," suggesting an acknowledgment of the existence of some outstanding debt. Absent an allegation that no monies are due and payable, the rule clearly requires the payment of a bond into the court registry. *See* Rule 14–209(b)(1)(2); *see also Jones, supra,* 178 Md.App. at 65–66, 940 A.2d 1109 (compliance with provisions of Rule 14–209(b) mandatory). It is undisputed that WFLP did not pay a bond into the court and the appellant does not challenge on appeal the trial court's finding that the "binding commit-

---

3. In its brief, G & G also rebuts the argument raised below by WFLP that the provisions of Md. Rule 15–503(c) pertaining to waiver of the bond requirement for a preliminary injunction or temporary restraining order also should apply to the bond requirement under Rule 14–209. While WFLP states in its recitation of the facts that this argument was raised below and includes Rule 15–503 in its appendix, it does not make this argument on appeal and therefore it is waived.

ment letter" from Divine Development was not an appropriate substitute for such payment.

WFLP relies on *Wells Fargo Home Mortgage, Inc. v. Neal*, 398 Md. 705, 922 A.2d 538 (2007), in support of its argument that it was not required to pay the amount due and payable under the IDOT into the court registry even if there was a "technical default." In *Wells Fargo*, the plaintiff, Neal, and his then wife executed an FHA Deed of Trust to secure a purchase money loan for a home. When the plaintiff later defaulted on his loan, Wells Fargo, the mortgagee by assignment, initiated foreclosure proceedings. The foreclosure proceedings were stayed when Neal filed a complaint in the circuit court alleging that Wells Fargo breached the terms of the deed of trust by failing to comply with pre-foreclosure loss mitigation procedures under U.S. Department of Housing and Urban Development (HUD) mortgage servicing regulations. The plaintiff pleaded a cause of action for breach of contract and also petitioned for declaratory relief[4] to prevent Wells Fargo from foreclosing on the property. The circuit court granted summary judgment in favor of Wells Fargo on both counts. This Court vacated the summary judgment on appeal and remanded the case for further proceedings with respect to the Neals' contract claim.

The Court of Appeals held that the plaintiff did not have a private cause of action based on a breach of the HUD regulations, but could "assert an allegation of regulatory noncompliance as a shield against unauthorized foreclosure actions." *Id.* at 721, 922 A.2d 538. The Court cited to statutory and regulatory history and HUD policy initiatives that made clear that loss mitigation efforts were mandatory and that noncompliance with the regulations was intended to be available as a defense to foreclosure. Accordingly, the Court concluded that failure to comply with the HUD loss mitigation procedures could be asserted as an affirmative defense "within the injunctive relief apparatus provided in Rule 14–209(b)(1)." *Id.* at

---

4. This count was treated as a request for injunctive relief.

727, 922 A.2d 538. Raising such a defense would allow the mortgagor to deny that any monies were due and payable and to claim that there was no default. Thus, the mortgagor would not be required to pay the alleged delinquent amount into the court registry pursuant to the Rule.

The *Wells Fargo* Court opined, "This is because, under principles of equity, a mortgagee's commencement of a foreclosure proceeding on an FHA-insured mortgage, without first having adhered to the mandatory HUD loss mitigation regulations, may invalidate the mortgagee's declaration of default." *Id.* at 728, 922 A.2d 538. Relying on the clean hands doctrine, the Court explained that, while the plaintiff "may be said to be in default, the legal fiction that no default exists may be maintainable until such time as Wells Fargo complies with the statutory and regulatory imperative to pursue loss mitigation prior to foreclosure." *Id.* at 730, 922 A.2d 538. The Court remanded the case to the circuit court for further proceedings to determine if the mortgagor could meet his burden of proving that Wells Fargo had failed to comply with the HUD regulations pertaining to loss mitigation prior to initiating foreclosure proceedings.[5]

Wells Fargo does not control the instant case in which the loan in question was commercial. The policy implications inherent in allowing mortgagees to avoid HUD regulations specifically designed to prevent unnecessary foreclosures are not implicated in the case at bar. *See id.* at 721, 922 A.2d 538 (loss mitigation efforts intended to provide "an alternative to foreclosure[ ]") (quoting 12 U.S.C. § 1715u(a) (2000)). Also, in *Wells Fargo,* if the mortgagor's allegations were proved correct, the mortgagee had prematurely declared the loan in default because HUD's loss mitigation procedures were a condition precedent to initiation of foreclosure. In the case at bar, as G & G persuasively argues, any alleged misconduct on its part was "totally unrelated to WFLP's default" and there

---

**5.** As no foreclosure sale had yet been held, the Court ordered that Neal's action for injunctive relief be consolidated with the foreclosure proceedings.

were "no facts [ ] introduced that G & G failed to perform a condition precedent to its right to declare the [ ] loan in default[.]" We cannot read *Wells Fargo* as standing for the proposition that any allegation of fraudulent or improper conduct relating to a loan transaction is sufficient to absolve the mortgagee of its obligation under Rule 14–209(b) to pay into the court registry any amount due and payable under the loan.[6]

WFLP failed to comply with the mandatory provisions of Rule 14–209(b). The circuit court did not abuse its discretion in denying WFLP's motion to stay foreclosure.[7] Accordingly, we shall affirm the judgment of the circuit court.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

**6.** Even if *Wells Fargo* could be read so broadly, it would not cure WFLP's failure to otherwise comply with Rule 14–209(b) as discussed, *supra*.

**7.** This Court need not address the issue of whether the membership interests were indeed fraudulent securities transactions.