35 A.3d 452

**Hosea ANDERSON, et ux.**

v.

**John S. BURSON, et al.**

**No. 8, Sept. Term, 2011.**

Court of Appeals of Maryland.

Dec. 20, 2011.

Reconsideration Denied Feb. 16, 2012.

Randall L. Hagen (Law Office of Randall L. Hagen, LLC, Columbia, MD), on brief, for Petitioners/Cross–Respondents.

Bizhan Beiramee (Bizhan Beiramee, Esq., P.C., McLean, Virginia), on brief, for Respondents/Cross–Petitioners.

Phillip Robinson, Anthony DePastina, Jesse L. Iliff, Civil Justice Inc., Baltimore, MD, for Amicus Curiae brief of Civil Justice Inc.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, * MURPHY, ADKINS and BARBERA, JJ.

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; he did not participate in the decision and adoption of this opinion.

HARRELL, J.

Petitioners, Hosea and Bernice Anderson (the Andersons), appear to be fairly typical representatives, in many ways, of the larger class of homeowners facing foreclosure during recent difficult economic times. The Andersons defaulted on their refinanced home mortgage [1] because of financial hardships. Faced with foreclosure, the Andersons initiated, among other maneuvers, a request to enjoin the seemingly flawed foreclosure action filed by Respondents. Respondents—the substitute trustees under the mortgage (Substitute Trustees), agents of the trustee, Deutsche Bank Trust Company Americas (Deutsche)—possess and seek to enforce an "under-indorsed" [2] mortgage note (the Anderson Note or Note), which, prior to coming into their possession, was transferred three times intermediately, bundled with a multitude of other mortgages, securitized, lost, and then discovered before the ultimate evidentiary hearing that paved the way for a foreclosure sale.

---

1. This case involves a deed of trust to secure repayment of the loan promissory note. Because the case before us turns on whether the Substitute Trustees may enforce the Anderson promissory note based on the proof of the quality (or lack thereof) of their possession of the note, whatever the recognized differences there are between whether the associated security instrument is a mortgage or a deed of trust, *see Simard v. White*, 383 Md. 257, 269–90, 859 A.2d 168, 175–88 (2004), are of no moment in resolving the present case. We have treated these two types of instruments interchangeably when discussing repayment of their associated notes. *See Hand v. Mfrs. & Traders Trust Co.*, 405 Md. 375, 387, 952 A.2d 240, 247 (2008); *Legacy Funding LLC v. Cohn*, 396 Md. 511, 513 n. 1, 914 A.2d 760, 761 n. 1 (2007); *May Dep't Stores v. Montgomery Cnty.*, 118 Md.App. 441, 451, 702 A.2d 988, 994 (1997). Therefore, we may use the term *mortgage*, at some points in this opinion, to embrace both mortgages and deeds of trust, without blurring their distinction for other purposes.

2. We describe the Note as "under-indorsed" for several reasons. The Anderson Note itself was unindorsed—despite the Substitute Trustees's initial representation that they possessed the Note indorsed in blank. The Substitute Trustees represented later that they did not have an allonge, but at a subsequent hearing, produced an undated allonge (unattached to the original note and signed by the initial holder only), which the Court of Special Appeals considered void. *Anderson v. Burson*, 196 Md.App. 457, 471, 9 A.3d 870, 878 (2010).

Securitization of residential mortgages, once a very lucrative practice, is denounced frequently now by the public and media, described as "shoveling loans into trusts like coal into the Titanic's boilers." Gretchen Morgenson, *Guess What Got Lost in the Pool?*, N.Y. Times, 1 Mar. 2009, at BU1. At best, it is a modern, fast-paced commercial practice that mis-aligns with some of the hoary law of negotiable instruments secured by realty. Yet only since the advent of the recent economic downturn have courts been called upon to consider the claims of borrowers challenging some of these industry practices and shortcomings.[3] This case presents an opportunity to clarify Maryland law regarding enforcement of defaults under unindorsed mortgage notes.

We shall affirm the Court of Special Appeals's holding that the trial court did not abuse its discretion in denying injunctive relief to the Andersons. Deutsche and its agents, the Substitute Trustees, are nonholders in possession and entitled to enforce the Anderson Note and deed of trust, notwithstanding the pitfalls in the securitization process suggested by the course of this case.

## I.  FACTS

### A.  Precursor Events to the Foreclosure

The Andersons refinanced their home mortgage in October 2006.[4] In accomplishing the refinancing, only Mr. Anderson

---

**3.** In a federal case, plaintiff-lender's condescending remarks to the court suggest the previous indifference to imprecise foreclosure practices. *In re Foreclosure Cases*, 1:07CV2282, 2007 WL 3232430, 2007 U.S. Dist. LEXIS 84011 (N.D. Ohio 31 Oct. 2007). The trial judge ordered the plaintiff-lender to cure its insufficient foreclosure complaint, to which counsel for the plaintiff-lender responded, "Judge, you just don't understand how these things work" and that "there appears to be some level of disagreement and/or misunderstanding amongst ... members of the judiciary." *In re Foreclosure Cases*, 2007 WL 3232430 at *3 & n. 3, 2007 U.S. Dist. LEXIS 84011 at *7 & n. 3 (applying federal rules of procedure). We do not suggest that the Substitute Trustees' trial or appellate counsel here acted in this manner.

**4.** The record extract does not disclose whether both of the Andersons executed the promissory note for the loan that existed before October

signed the promissory note and both of the Andersons signed the deed of trust[5] (the Anderson Note and deed of trust may be referred to collectively as the Anderson Mortgage) in favor of Wilmington Finance, Inc. (Wilmington). Saxon Mortgage Services, Inc. (Saxon) serviced the Anderson Mortgage and collected Mr. Anderson's payments, such as they were. Due to economic hardships that ensued, Mr. Anderson defaulted quickly on his Note obligations in 2007, and the Substitute Trustees commenced foreclosure proceedings on 21 February 2008 in the Circuit Court for Howard County. The Substitute Trustees filed an order to docket, which included a motion for acceptance of lost note affidavit.[6] The Circuit Court judge granted the motion.

---

2006. This is noteworthy only because of the fact that, for reasons that are unexplained in this record extract, only Mr. Anderson appears to have signed the promissory note for the October 2006 refinancing.

5. The deed of trust states that Mrs. Anderson mortgaged to Wilmington Finance, Inc. her interest in the Andersons' residence:

Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-sign this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

6. A foreclosure plaintiff commences an action to foreclose a deed of trust, which contains a power of sale provision, by filing an order to docket. *See* Md. Rule 14–207(a)(1); Md.Code Ann., Real Prop. § 7–105.1(d) (LexisNexis Supp.2011). An order to docket must include, among other documentation: a copy of the deed of trust, supported by an affidavit that it is a true and accurate copy; a copy of the debt instrument, supported by an affidavit certifying ownership of the debt instrument; and a deed of appointment of a substitute trustee, supported by an affidavit that it is a true and accurate copy of the deed of appointment. Md. Rule 14–207(b); Real Prop. § 7–105.1(d)(1)–(2).

The Circuit Court may not accept a lost note affidavit, in lieu of a copy of the debt instrument, unless the affidavit: "(1) [i]dentifies the owner of the debt instrument and states from whom and the date on which the owner acquired ownership; (2) [s]tates why a copy of the debt instrument cannot be produced; and (3) [d]escribes the good faith

On 13 March 2008, the Andersons caused a temporary halt in the foreclosure action by filing for Chapter 13 Bankruptcy relief, in which they listed Saxon as a secured creditor. As part of a consent order in the federal court resolving Saxon's motion for relief from the bankruptcy stay, the Andersons acknowledged the mortgage debt, and Mr. Anderson agreed to cure the missed payments over six equal-monthly payments of $804.44. A prompt default ensued under this new payment plan.

Meanwhile, investors were securitizing the Anderson Note into an investment trust. To provide some appreciation of the securitization process, we shall divert briefly from our recitation of the material facts in this case.

Securitization starts when a mortgage originator sells a mortgage and its note to a buyer, who is typically a subsidiary of an investment bank. Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, 78 U. Cin. L.Rev. 1359, 1367 (2010). The investment bank bundles together the multitude of mortgages it purchased into a "special purpose vehicle," [7] usually in the form of a trust, and sells the income rights to other investors. *Id.* A pooling and servicing agreement establishes two entities that maintain the trust: a trustee, who manages the loan assets, and a servicer, who communicates with and collects monthly payments from the mortgagors. *Id.*

Mortgage-securitization investors utilize the Mortgage Electronic Registration System (MERS), a private land-title regis-

---

efforts made to produce a copy of the debt instrument." Real Prop. § 7–105.1(d–1).

The Substitute Trustees filed a lost note affidavit and a motion for acceptance of lost note affidavit. As to why a copy of the Anderson Note could not be produced, the lost note affidavit stated simply that the Note "has been lost or destroyed and cannot be produced."

7. "A special purpose vehicle is a business entity that is exclusively a repository for the loans; it does not have any employees, offices, or assets other than the loans it purchases." Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, 78 U. Cin. L.Rev. 1359, 1367 (2010).

tration system created by mortgage banking companies to expedite the securitization process. *See Jackson v. Mortg. Elec. Registration Sys.*, 770 N.W.2d 487, 490 (Minn.2009). MERS increases the efficiency and profitability of mortgage markets by skirting the traditional land-title recording process in localities, which can be costly and time consuming, and replacing it with the industry's own electronic tracking system. *See Jackson*, 770 N.W.2d at 490–91. To do so, the mortgage broker names MERS as a nominal mortgagee [8] in the mortgage. Then, subsequent transfers of the mortgage are recorded electronically and entirely on MERS while the original mortgage, recorded in the public land title records, remains unchanged. *Jackson*, 770 N.W.2d at 490; Peterson, *supra*, at 1371. MERS's industry-appreciated virtues have made it a near ubiquitous aspect of contemporary residential mortgages; two-thirds of all newly originated residential loans in the United States name MERS as the nominal mortgagee. *See Jackson*, 770 N.W.2d at 491–92; Peterson, *supra*, at 1370.

While MERS enables investment banks to rush millions of mortgages through the securitization process at a rapid rate, the volume and profitability has come at a cost. Mortgage transferors frequently lose or misplace mortgage documents [9] and fail to indorse mortgage notes, shortcomings that transferees are willing to overlook lest they be slowed down by traditional negotiable instrument formalities. We shall return now to our regularly scheduled opinion.

---

8. The Anderson Mortgage lists MERS as the *nominee*.

9. One Florida Legal Aid attorney estimated that 80 percent of her foreclosure proceedings involve a lost note affidavit. Bob Ivry, *Banks Lose to Deadbeat Homeowners as Loans Sold in Bonds Vanish*, Bloomberg, Feb. 22, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aejJZdqodTCM. This begs the question, where do the mortgage notes go? While one bankruptcy judge guessed the notes were being sent to a warehouse, a real estate lawyer remarked that they are being " 'sent to the inside of a mountain in the middle of America.' " Symposium, *Consumer Bankruptcy Panel: A Brave New World (of Foreclosure)*, 27 Emory Bankr.Dev. J. 257, 273 (2011); Ivry, *supra*.

### B. The Anderson Note

In route to being securitized, the Anderson Note was transferred, but not indorsed correspondingly, three times. First, the initial lender, Wilmington, transferred the Note to Morgan Stanley Mortgage Capital Holding, Inc. (Morgan Stanley I), who in turn transferred the Note to Morgan Stanley ABS Capital I Inc. (Morgan Stanley II). Morgan Stanley II securitized the Anderson Note, along with a multitude of others, into the Morgan Stanley Home Equity Loan Trust 2007–2 (Morgan Stanley Trust). The Morgan Stanley Trust pooling and servicing agreement (PSA) named Deutsche as trustee (and Saxon as servicer), and so the note was transferred to Deutsche as trustee.

### C. The Andersons Challenge the Substitute Trustees' Right to Enforce the Note

Upon Mr. Anderson's latest default in making payments under the bankruptcy plan, the Substitute Trustees, after reinstating the foreclosure process in the Circuit Court, scheduled a foreclosure sale for 18 November 2008. On 12 November 2008, the Andersons filed an injunction request in the foreclosure action. The Circuit Court enjoined temporarily the foreclosure proceeding until a hearing could be held regarding the sought-after injunction.

A total of three hearings took place. At the first hearing, on 26 November 2008, the Substitute Trustees, despite the earlier lost note affidavit, produced a photocopy of the unindorsed Note and stated that the original note was indorsed in blank (which ultimately proved to be an inaccurate statement). The Circuit Court judge, exercising commendable caution in the face of the curious turn of events, rescheduled the evidentiary hearing to determine the Substitute Trustees' right to enforce the Note.

At the second hearing, on 7 January 2009, the Substitute Trustees produced the original Note, unindorsed, and asserted, "We have the original Note, but we do not have an indorsement; we do not have an assignment; *we do not have*

*an allonge* ...."[10] Because the Substitute Trustees failed to comply with the Andersons' discovery request for a copy of the Morgan Stanley Trust PSA, the parties and the Circuit Court judge agreed to continue again the evidentiary hearing.

At the third hearing, on 31 March 2009, the Substitute Trustees produced the following evidence to legitimize their claim to enforce the Anderson Note: testimony from Dennis Sugrue, Esquire, a lawyer from the Substitute Trustees' firm;[11] a MERS report showing that Wilmington transferred the beneficial rights to the Anderson Note to Morgan Stanley I on 12 February 2007 and servicing rights to Saxon on 14 February 2007; the Anderson deed of trust naming MERS as the nominee; and the Andersons' Chapter 13 Bankruptcy Schedule D, which listed Saxon as a secured creditor. In addition, the Substitute Trustees (pulling yet another rabbit from their magician's hat) produced an undated, unattached allonge, signed by Wilmington purported transferring the Note to Deutsche, but which did not contain indorsements from the parties that possessed intermediately the Note. The Substitute Trustees argued that the allonge made them holders of the Note. The allonge contained a Saxon loan number, which matched a handwritten number on the Anderson Note but did not match the Wilmington loan number.

Seizing upon the absence of indorsements by the intervening transferors, the Andersons riposted that, other problems

---

10. An allonge (not to be confused by a lay reader with a lozenge) is typically a "slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." Black's Law Dictionary 88 (9th ed. 2004).

11. Mr. Sugrue, who was assertedly familiar with his firm's file regarding the Anderson Note, testified on direct and cross-examination that the deed of trust terms permitted the Note to be transferred to others; that Wilmington transferred the Note's beneficial rights to Morgan Stanley I on 12 February 2007 and servicing rights to Saxon on 14 February 2007; that the Saxon's loan number, handwritten on the Note, matched the loan number on the allonge, the MERS report, and the Andersons' bankruptcy documents; and that Deutsche's role as trustee and holder did not arise until 1 March 2007.

aside, Wilmington lacked the capacity to indorse the Note to Deutsche, via the allonge, because Wilmington had transferred previously its interest to Morgan Stanley I on 12 February 2007. In support of this argument, the Andersons, during their counsel's cross-examination of Mr. Sugrue, introduced into evidence an excerpt from the PSA establishing that Deutsche's interest in the transactions regarding the Note was not created until 1 March 2007. The Andersons urged that, when Wilmington indorsed purportedly the Note to Deutsche (after 1 March 2007), Wilmington had transferred already its interest in the Note to Morgan Stanley I (on 12 February 2007), and, thus, had no interest left to convey to Deutsche at that time.

The Circuit Court ruled in favor of the Substitute Trustees, finding that Wilmington indorsed successfully the Note to Deutsche via the allonge, despite acknowledging indorsement gaps in the Note's overall transfer history. Thus, the trial judge determined that the Substitute Trustees were holders of the Note under Maryland Code, Commercial Law § 3–302(a),[12] and denied the Andersons' demand for an injunction.

The Andersons noted timely an appeal to the Court of Special Appeals. Our appellate colleagues disregarded the allonge because Wilmington transferred its rights in the Note to Morgan Stanley I before it purported to indorse the Note to Deutsche via the allonge. The Court of Special Appeals concluded, nonetheless, that Deutsche was entitled to enforce

---

**12.** Maryland Code, Commercial Law § 3–302(a) (2002) provides:

Subject to subsection (c) and § 3–106(d), "holder in due course" means the holder of an instrument if: (1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and (2) The holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in § 3–306, and (vi) without notice that any party has a defense or claim in recoupment described in § 3–305(a).

the instrument. Under the "shelter rule," Deutsche was held to be a nonholder in possession with the rights of a holder, pursuant to Maryland Code, Commercial Law § 3–301(ii) (LexisNexis 2002).[13] *Anderson v. Burson*, 196 Md.App. 457, 469–75, 9 A.3d 870, 877–80 (2010).

The Andersons petitioned us for a writ of certiorari, which we granted, 418 Md.App. 586, 16 A.3d 977 (2011), to consider the following questions:

I. Did the Court of Special Appeals err in determining that the Substitute Trustee's principal, Deutsche, was a "nonholder in possession of the Note who has the rights of a holder," where Deutsche filed a Lost Note Affidavit in which Deutsche admitted that it did not possess the Note at the time this case was filed?

II. Did the Court of Special Appeals err in relying on the Uniform Commercial Code, as enacted in Maryland, to determine that the unindorsed Note was properly transferred to Deutsche, while disregarding contrary language in the Pooling and Servicing Agreement which created the securitized trust?

We granted also the Substitute Trustee's timely cross-petition in which they asked, "Did the Court of Special Appeals err in determining ineffective an indorsement by the named payee [the allonge] after it had transferred the note?"

We shall affirm the Court of Special Appeals's judgment and hold that the Circuit Court did not abuse its discretion in denying the Andersons' request to enjoin the foreclosure sale of the home securing the loan. The Substitute Trustees, as agents for Deutsche, are nonholders in possession of the instrument and have the rights of holders. Because the

---

13. Maryland Code, Commercial Law § 3–301 (2002) provides:

"Person entitled to enforce" an instrument means (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to § 3–309 or § 3–418(d). A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.

Andersons conceded the transfer history of the Note, the Substitute Trustees may enforce the Anderson Mortgage as nonholders in possession. Consequently, we do not reach the question posed in the Substitute Trustees' cross-petition.

■ We shall not decide the Andersons' second question either because they waived it. Ordinarily, we will consider an issue that has been raised in the petition for certiorari, but only if has been preserved for review by this Court. Md. Rule 8–131(b). The Andersons waived this argument by not raising it at trial or in their initial brief in the Court of Special Appeals. *See Anderson,* 196 Md.App. at 476, 9 A.3d at 881 (citing *Strauss v. Strauss,* 101 Md.App. 490, 509 n. 4, 647 A.2d 818, 828 n. 4 (1994)) ("A reply brief cannot be used as a tool to inject new arguments."). As interesting as an unpreserved question appears to us, we will not grant ordinarily to petitioners a new bob at a long-floating apple.

## II. STANDARD OF REVIEW

■ The grant or denial of injunctive relief in a property foreclosure action lies generally within the sound discretion of the trial court. *Wincopia Farm, LP v. Goozman,* 188 Md. App. 519, 528, 982 A.2d 868, 873 (2009) (citing *Jones v. Rosenberg,* 178 Md.App. 54, 65, 940 A.2d 1109, 1115 (2008)). Therefore, we review the trial court's grant or denial of a foreclosure injunction for an abuse of discretion. *Id.* (citing *Jones,* 178 Md.App. at 65, 940 A.2d at 1115). Abuse of discretion means that a ruling will be reversed when that ruling " 'does not logically follow from the findings from which it supposedly rests or has no reasonable relationship to its announced objective.' " *Eastside Vend Distrib., Inc. v. Pepsi Bottling Group, Inc.,* 396 Md. 219, 240, 913 A.2d 50, 63 (2006) (quoting *Dehn v. Edgecombe,* 384 Md. 606, 628, 865 A.2d 603, 616 (2005)). We review the trial and intermediate appellate courts' legal conclusions, however, nondeferentially. *Wincopia Farm,* 188 Md.App. at 528, 982 A.2d at 873 (citing *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.,* 169 Md.App. 137, 145, 899 A.2d 956, 961 (2006)); *see also Garfink v. Cloisters at*

*Charles, Inc.*, 392 Md. 374, 383, 897 A.2d 206, 211 (2006) (stating that questions of law are reviewed without deference).

## III. DISCUSSION

■ The Andersons argue initially that, because the Substitute Trustees commenced the foreclosure action by filing a lost note affidavit stating that the Anderson Note was either lost or destroyed and cannot be produced, the Substitute Trustees could not have been in possession of the Note at the time the suit was instituted. The Substitute Trustees counter that they produced the Anderson Note, albeit at the third and final evidentiary hearing before the foreclosure occurred. They assert also that nothing more should be made of the lost note affidavit than that the Note was merely unavailable at the time they filed the action.

The relief requested here by the Andersons—remand to the Circuit Court for new proceedings—is impractical and judicially inefficient on the conceded facts in this record. *See Bankers Trust of Cal., N.A. v. Neal,* 64 Conn.App. 154, 779 A.2d 813, 815 (2001) (stating that no practical relief was available to defendant where plaintiff amended its complaint to include a lost note affidavit). On remand, the Substitute Trustees would file a new or amended order to docket with a copy of the Note. In light of the Andersons' acknowledgments of the Note's transfer history, the affirmed existence of the debt, and Mr. Anderson's default (and our conclusions of law discussed below), the Substitute Trustees would prevail most likely.

The Andersons argue alternatively that the Substitute Trustees produced no evidence that they possess the Note currently and lawfully, and did not meet their burden of proof[14] in

---

**14.** The Substitute Trustees retort they do not have a burden of proof because Maryland is a nonjudicial foreclosure state. Their characterization of Maryland's foreclosure statute as nonjudicial is slightly inaccurate. While all nonjudicial foreclosure statutes allow holders of mortgages with a power of sale provision to sell the property privately, 4 Richard R. Powell, *Powell on Real Property* § 37.42 (Michael Allan Wolf, ed. 2011), many nonjudicial foreclosure statutes do not require the mortgagee to produce the mortgage note at all. *See, e.g., Tina v.*

that regard; therefore, they and their principal, Deutsche, cannot enjoy the rights of a holder. We agree that, when put at issue properly (as was the case here), a reputed transferee in possession of an unindorsed mortgage note has the burden to establish its rights under that note—especially in instances where the mortgagor requests an injunction to foreclose enforcement by the possessor based on such a defense. Maryland Rule 14–207(b)(3) [15] requires a mortgagee to produce a copy of the note. Thereafter, the Maryland Commercial Law Article takes over and, as discussed below, requires a person in possession of an unindorsed mortgage note to prove that note's prior transfer history (as opposed to a holder, whom the Commercial Code presumes is entitled to payment under § 3–308(a)).[16] Additionally, given the chain-of-possession document quagmire exemplified by this case, fairness dictates that

*Countrywide Home Loans, Inc.*, No. 08 CV 1233 JM (NLS), 2008 WL 4790906, *8, 2008 U.S. Dist. Lexis 88302, *21 (S.D.Cal. Oct. 30, 2008) ("[The California Civil Code] outlines the requirements for nonjudicial foreclosures in California, and does not include providing the original note prior to the sale."). Maryland Rule 14–207(b)(3) requires, in contrast, the mortgagee to produce a copy of the mortgage note. Thus, Maryland's statute does not fall squarely within concept of nonjudicial foreclosure.

**15.** Maryland Rule 14–207(b) (2011) provides, "Exhibits. A complaint or order to docket shall include or be accompanied by: ... a copy of any separate note or other debt instrument supported by an affidavit that it is a true and accurate copy and certifying ownership of the debt instrument; ...."

**16.** Maryland Code, Commercial Law § 3–308(a) (2011) provides:

In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature. If an action to enforce the instrument is brought against a person as the undisclosed principal of a person who signed the instrument as a party to the instrument, the plaintiff has the burden of establishing that the defendant is liable on the instrument as a represented person under § 3–402(a).

the mortgagee produce the necessary proof, when that matter is put at issue properly.

The Maryland Code, Commercial Law Article governs a negotiable promissory note that is secured by a deed of trust. *Silver Spring Title Co. v. Chadwick,* 213 Md. 178, 181, 131 A.2d 489, 490 (1957); *Le Brun v. Prosise,* 197 Md. 466, 474–75, 79 A.2d 543, 548 (1951); Md.Code Ann., Com. Law § 9–203(g) & cmt. 9 (LexisNexis 2002). The deed of trust cannot be transferred like a mortgage; rather, the corresponding note may be transferred, and carries with it the security provided by the deed of trust. *Le Brun,* 197 Md. at 474, 79 A.2d at 548. Therefore, we analyze the parties' dispute here in light of the Commercial Law Article.

Whether a negotiable instrument, such as a deed of trust note, is transferred or negotiated dictates the enforcement rights of the note transferee. A transfer has two requirements: the transferor (any person that transfers the note, except the issuer) must intend to vest in the transferee the right to enforce the instrument (thieves and accidental transferees are excluded) and must deliver the instrument so the transferee receives actual or constructive possession. Com. Law § 3–203(b); 6B Lary Lawrence, *Anderson on the Uniform Commercial Code* § 3–203:5R (3d ed.2003). A transfer vests in the transferee only the rights enjoyed by the transferor, which may include the right to enforce the instrument. Com. Law § 3–203(a)–(b).[17]

A negotiation, by contrast, occurs when a holder—who is either the named payee of an instrument or the transferee of a

---

**17.** Maryland Code, Commercial Law § 3–203(a)–(b) provides:

(a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

negotiated instrument—transfers possession of an instrument, payable to bearer, to another. Com. Law § 3–201(a)–(b) & cmt. 1. A negotiation of an instruments payable to an identified person, however, requires the holder to transfer possession and indorse the instrument, i.e., negotiate the instrument. *Id.* Importantly, only a holder may negotiate an instrument. Com. Law § 3–203 cmt. 1. Thus, a recipient of a transferred instrument is a transferee, but a recipient of a negotiated instrument is a holder.

With that distinction in mind, Commercial Law § 3–301 explains that a person entitled to enforce a negotiable instrument may be either of three varieties: "(i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder [i.e., a transferee] or (iii) a person not in possession of the instrument who is entitled to enforce pursuant to § 3–309 . . . ." [18]

On the record before us, Deutsche is not a holder of the Anderson Note. Deutsche possesses the Note, which is payable to Wilmington, but Wilmington did not indorse the Note itself. Although the Substitute Trustees urge that the allonge indorses purportedly the Note to Deutsche, the allonge is anachronistically impossible. Deutsche's role as trustee did

---

**18.** Maryland Code, Commercial Law § 3–309 provides:

(a) A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

(b) A person seeking enforcement of an instrument under subsection (a) must prove the terms of the instrument and the person's right to enforce the instrument. If that proof is made, § 3–308 applies to the case as if the person seeking enforcement had produced the instrument. The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.

not arise until after Wilmington had transferred its rights to Morgan Stanley I; thus, by the time Wilmington reputedly made the allonge to Deutsche, Wilmington had no rights in the Note to transfer. Therefore, Wilmington did not negotiate the Note to Deutsche.

The Commercial Law Article recognizes alternatively that an instrument may be enforced, under Commercial Law § 3–301(ii), by a nonholder in possession of an instrument who has the rights of a holder, i.e., a transferee in possession or nonholder in possession. Com. Law § 3–301 cmt. ("The definition [of person entitled to enforce instrument] recognizes that enforcement is not limited to holders."). A nonholder in possession may enforce an instrument under Commercial Law § 3–301(ii) if his/her transferor was a holder, because a transferee obtains the rights of his transferor/holder, which includes the right to enforce the instrument. Com. Law § 3–203, cmt. 2. A transferee obtains also the rights that his transferor obtained from his own transferor. This principle is known as the "shelter rule." Lawrence, *supra*, § 3–203:15R to 16R (3d ed.2003).

Deutsche, as transferee, obtained from Wilmington the rights of a holder from Wilmington under the shelter rule. Wilmington was a holder because Wilmington possessed the Note, which is payable to it. *See* Com. Law § 1–201(20). Based on the record in the present case, it is conceded that Wilmington transferred the Anderson Note, which, after several intervening transfers, is now possessed by Deutsche and its agents, the Substitute Trustees. No entity in the Note's transfer chain is claimed to have acquired possession of the Note by theft or accident. There can be little doubt, in this context, that each transferor—Wilmington, Morgan Stanley I, and Morgan Stanley II—intended to vest in its transferee the right to enforce the Note. Therefore, the successful series of Note transfers from Wilmington to Deutsche vested in Deutsche Wilmington's rights as a holder.

A nonholder in possession, however, cannot rely on possession of the instrument alone as a basis to enforce it. The

transferee's right to enforce the instrument derives from the transferor (because by the terms of the instrument, it is not payable to the transferee) and therefore those rights must be proved. Com. Law § 3–203 cmt. 2; *accord Leavings v. Mills,* 175 S.W.3d 301 (Tex.Ct.App.2004) ("A person not identified in a note who is seeking to enforce it as the owner or holder must prove the transfer by which he acquired the note.") The transferee does not enjoy the statutorily provided assumption of the right to enforce the instrument that accompanies a negotiated instrument, and so the transferee "must account for possession of the unindorsed instrument by proving the transaction through which the transferee acquired it." Com. Law § 3–203 cmt. 2. If there are multiple prior transfers, the transferee must prove each prior transfer. *U.S. Bank Nat'l Assoc. v. Ibanez,* 458 Mass. 637, 941 N.E.2d 40, 53 (2011) (citing *In re Parrish,* 326 B.R. 708, 720 (Bankr.N.D.Ohio 2005)). Once the transferee establishes a successful transfer from a holder, he or she acquires the enforcement rights of that holder. *See* Com. Law § 3–203 cmt. 2. A transferee's rights, however, can be no greater than his or her transferor's because those rights are "purely derivative." Lawrence, *supra,* § 3–203:15R. Thus, the Substitute Trustees here, who possess an unindorsed note and wish to enforce it, had the burden of proving their status as nonholder in possession.

At the injunction hearing, the Substitute Trustees failed to prove every prior transaction through which it acquired purportedly nonholder status. Instead, the Substitute Trustees focused on proving that the unattached, undated allonge was a legitimate and effective indorsement from Wilmington to Deutsche and, as a result, fell short of the proof requirements of Commercial Law § 3–203(b).[19] The Substitute Trustees

---

**19.** We do not decide whether the copy of the MERS report, printed from a website, and the testimony from Mr. Sugrue established the Note transaction between Wilmington and Morgan Stanley I because the Substitute Trustees failed to prove the remaining transactions. Although, while mere introduction of a note or testimony alone fails to establish nonholder status, "both and a bit more" would likely establish holdership rights. *State Sav. & Loan Assoc. v. Liberty Trust Co.,* 863

produced no evidence to prove the Morgan Stanley I to Morgan Stanley II transfer. Even a single break in the transaction chain can be fatal to a transferee's claim of holder status.

The Substitute Trustees also failed to prove the transfer from Morgan Stanley II to Deutsche. Although they rely on the excerpt from the PSA (actually produced by the Andersons) to prove the transaction between Morgan Stanley II and Deutsche, the PSA excerpt is incomplete in a material way. The excerpt contained a mere 22 pages of a voluminous document (estimated at 950 pages), and none of the excerpt pages in the record provide sufficient evidence that Mortgage Stanley II transferred the Note to Deutsche.

Assuming arguendo that the complete PSA were before us,[20] the PSA fails to "clearly and specifically identif[y] the mortgage at issue as among those assigned" to the Morgan Stanley Trust. *Ibanez,* 941 N.E.2d 40 at 53.[21] According to the terms

F.2d 423, 426 (5th Cir.1989) (stating that a bank established itself as a nonholder in possession where the bank produced an unindorsed promissory note and uncontested witness testimony regarding transfer of the promissory note).

20. The Substitute Trustees imply in their brief and at oral argument that the missing portions of the PSA could be retrieved, as a public document, from the Security and Exchange Commission's (SEC) website and judicial notice could be taken of the complete document. *See* Md. Rule 5–201. For the sake of completeness, the Court examined, with some difficulty, the PSA; however, the Court's role is not to engage in a scavenger hunt in the electronic maze that is the SEC website.

21. Although we extract from *Ibanez* this proposition, the case has limited persuasive value regarding its ultimate conclusion that the mortgagee-lenders failed in that case to prove holder status. Maryland law and Massachusetts law differ over the transfers of mortgages. *Ibanez* held that the mortgage must be transferred with the mortgage note. Maryland law holds that the mortgage transfers with the mortgage note. *Le Brun v. Prosise,* 197 Md. 466, 474–75, 79 A.2d 543, 548 (1951) (" 'The note and the mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity.' " (quoting *Carpenter v. Longan,* 83 U.S. 271, 274, 16 Wall. 271, 21 L.Ed. 313, 316 (1873))); Md.Code Ann., Com. Law § 9–203(g) &

of the PSA, the mortgage loan schedule, which identifies the individual mortgage loans that comprise the Morgan Stanley Trust, are located in Schedule I of the PSA. Schedule I states, however, that the mortgage loan schedule has been "Delivered to the Securities Administrator and the Trustee and *not attached to the Pooling and Servicing Agreement.*" (Emphasis added.) The PSA failed to identify the Anderson Note as among those that comprise the Morgan Stanley Trust. Thus, the PSA on the SEC website failed to evince that Morgan Stanley II transferred the Note to Deutsche.

Despite the many shortcomings of the Substitute Trustees' evidence, the Andersons conceded in their reply brief in the Court of Special Appeals that Deutsche holds the Note currently. In their reply brief in the Court of Special Appeals, the Andersons wrote:

> The evidence at trial established that the Note has changed ownership at least three times, summarized as follows: 1. On October 13, 2006, [the Andersons] refinanced their home loan with Wilmington. . . . 2. On February 12, 2007, Wilmington transferred the beneficial rights in the Note to [Morgan Stanley I]. 3. Subsequent to February 12, 2007, but before March 1, 2007 . . . [Morgan Stanley I] transferred its ownership of the Note to [Morgan Stanley II]. 4. On March 1, 2007, [Morgan Stanley II] sold, transferred, assigned, set over and conveyed to [Deutsche], as trustee for the [Morgan Stanley Trust], all right, title and interest in and to the Note and other pooled mortgage loans.

Also, at trial in cross-examination of Mr. Sugrue, the Andersons' counsel inquired rhetorically, "So you would agree that the [Morgan Stanley Trust] is the actual location where the Andersons' Note and Deed of Trust [are] located . . . ?" [22]

---

cmt. 9 (LexisNexis 2002) ("Subsection (g) codifies the common law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien.").

**22.** Mr. Anderson conceded the debt also by listing Saxon as a secured creditor; renegotiating his mortgage payments during his Chapter 13

Our appellate colleagues noted these facts as undisputed. *Anderson*, 196 Md.App. at 469, 9 A.3d at 877. We take into account the Andersons' factual concessions as part of our analysis. *See Weil v. Free State Oil Co.*, 200 Md. 62, 66, 87 A.2d 826, 827 (1952) ("An appellant can, of course, abandon some of the issues raised below and stand here [in the Court of Appeals] on narrower ground."); *Hughes v. Insley*, 155 Md.App. 608, 623, 845 A.2d 1, 9 (2003) (using appellant's concession of fact to reject his argument).

On the record here, the Substitute Trustees may enforce the Anderson Note as nonholders in possession who have the rights of holders. Because the Note is unindorsed, the Substitute Trustees, putting aside the potential ramifications of their cross-petition question, had to prove the Note's transfer history in order to establish their rights as a nonholder in possession. The Andersons' concessions established the Note's transfer history, clearing the way for the Substitute Trustees to enforce the Anderson Mortgage through foreclosure. Therefore, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONERS TO PAY COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.**

Bankruptcy; and paying, without protest, mortgage payments to Saxon (to the extent that he made payments).