*John S. Burson, et al., v. Jeffrey G. Capps*, No. 2, September Term, 2014

**Federal Truth in Lending Act—Right of Rescission—Statutory Interpretation**
Under the federal Truth in Lending Act (TILA), the right of rescission granted in 15 U.S.C. § 1635 may not be invoked by borrowers before the loan transaction is consummated. Before consummation, there is nothing for a borrower to rescind. An attempt to do so is without effect. Our holding is consistent with Regulation Z, TILA's implementing regulation, which presupposes that, when the right to rescission is exercised, there is something to rescind.

Circuit Court for Frederick County
Case No. 10-C-09-003783

Argued: September 9, 2014

IN THE COURT OF APPEALS OF
MARYLAND

No. 2

September Term, 2014

JOHN S. BURSON, ET AL.

v.

JEFFREY G. CAPPS

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

Opinion by Harrell, J.
Adkins and McDonald, JJ., concur in part
and dissent in part.
Watts, J., joins judgment only.

Filed: October 23, 2014

May one undo what one has not done yet?  Although the answer to this abstract question has been the premise for many a time travel "B" movie, it bodes even less well for a borrower or borrowers attempting to rescind loans that have not been consummated, within the meaning of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq* (2012).  Prior to closing on a home refinancing loan, Respondent, Jeffrey G. Capps, submitted a notice of rescission of the loan to the lender.  A day or two after submitting the notice, Capps signed a Note and Deed of Trust consistent with the negotiated terms of the ostensibly rescinded loan.  The loan proceeds were distributed as agreed to previously by the parties.  Capps made payments on the Note for approximately two years before defaulting on the loan.  After a foreclosure sale occurred, Capps filed exceptions, arguing that he had rescinded validly the loan pursuant to 15 U.S.C. § 1635.  The Circuit Court for Frederick County overruled the exceptions and ratified the sale.  In an unreported opinion, the Court of Special Appeals reversed the Circuit Court, holding that the rescission notice was timely.  Because there was no language in § 1635[1] or Regulation

---

[1] The relevant portion of the statute is as follows:

> Except as otherwise provided in this section, *in the case of any consumer credit transaction . . .* in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, *the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction* or the delivery of the information and rescission forms required under this section . . . , whichever is later, by notifying the creditor, in accordance with regulations of the Bureau, of his intention to do so. . . .  The creditor shall also provide, in accordance with

(Continued…)

Z[2]—TILA's implementing regulation—*prohibiting* a borrower from rescinding a loan prior to consummation of the transaction, the intermediate appellate court reasoned that such an initiative, when viewed in a light favoring borrowers, was supported by the statute.  We shall reverse, holding that, under TILA, the loan may not be rescinded before it came into being.

JUST THE FACTS, IF YOU PLEASE

In March of 2003, Respondent, Jeffrey G. Capps (hereinafter "Capps"), purchased a home located at 2909 Loch Haven Court, Ijamsville, Maryland.  Early in 2007, Capps decided to pursue refinancing his home loan.  He applied for refinancing through

(… Continued)

> regulations of the Bureau, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a) (2012) (emphasis added).

[2] The relevant portion of the regulation is as follows:

> (2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram, or other means of written communication.  Notice is considered given when mailed, or when filed for telegraphic transmission, or, if sent by other means, when delivered to the creditor's designated place of business.

> (3) *The consumer may exercise the right to rescind until midnight of the third business day following the occurrence described in paragraph (a)(1) of this section that gave rise to the right of rescission*, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last. . . .

12 C.F.R. § 226.15(a) (2013).

Endeavor Mortgage Group—a loan broker—to EquiFirst Corporation. In February of 2007, EquiFirst offered Capps terms of a refinancing, which offer he rejected. In March of 2007, EquiFirst offered Capps a second proposal, which he rejected as well. In April of 2007,[3] EquiFirst offered Capps a third refinance package, which he accepted.

The state of this record conjures illusions of multiple factual currents, pulling in seemingly different directions. Although we find no material disputes of fact were generated properly with regard to the dispositive question before us,[4] and accordingly no evidentiary hearing was sought or held, we shall call-out the confusion generated and burn away the obscuring fog at the same time.

The Deed of Trust and Adjustable Rate Note implementing the third offer were signed by Capps on 17 April 2007.[5] These documents secured a loan for $350,000. The

---

[3] All further references in this opinion to "April" refer to dates in April of 2007, unless specifically noted otherwise.

[4] The essential material facts that tee-up the question before us are: (1) Capps transmitted what he purported to be a notice of rescission of the agreed upon third refinance loan proposal before April 17; (2) the note and deed of trust, which were consistent with the loan proposal bearing Capps's signature, are dated April 17; (3) Capps accepted the benefits of the distribution of the loan proceeds; (4) Capps paid on the note, according to its terms, for approximately two years; (5) Capps lost his job and defaulted on the loan, which led to this foreclosure action; and, (6) for purposes of this litigation in the posture in which it reaches us, *see infra* note 18 and accompanying text, his defense was that he rescinded the loan properly under TILA.

[5] Although Capps's signature on these documents is not dated separately, the typed date of each of these documents is April 17. At different points in this litigation, Capps sought, as the spirit or occasion moved him, to argue inconsistent inferences as to when the loan documents were signed by him. In a Declaration (attached as Exhibit 1 to his Motion to Stay and Dismiss Foreclosure Action in the trial court), dated 30 December 2009, Capps seems unwilling to admit that the Deed of Trust and Note were signed on

(Continued…)

3

(… Continued)

April 17, although he does not allege actually otherwise: "In April of 2007, EquiFirst offered a third mortgage to me. I signed it, but, on April 16, 2007, I exercised the right to rescind the Note and sent the TILA rescission notice to EquiFirst by fax."

Capps urges an inference—but does not allege actually—that the loan documents were misdated. Sometimes Capps implied before the Circuit Court that the loan documents were signed *before* April 17. *See* Def.'s Mot. to Stay & Dismiss Foreclosure Action ("In this case, the lender EquiFirst provided defendant with the proper notice [of the right to rescission] and forms, and defendant completed the forms and exercised that right. At that point, the Note was rescinded and had no legal effect."); Def.'s Exceptions to Foreclosure Sale (arguing the same, but referring to the Note *and* Deed of Trust); *see also* Resp't's Opp'n to Pet. for Cert. 4; Official Tr. of Proceedings (Exceptions Hr'g); Br. of Rsp't 4–5. Before us, Capps implies that the loan documents were signed *after* April 17. *See* Resp't's Opp'n to Pet. for Cert. 3 ("It is obvious in this case that the lender violated [12 C.F.R. § 226.15(c), requiring the lender to disburse the funds at least three days after the loan documents were signed] and disbursed the funds before the three day waiting period had expired."). Elsewhere, Capps alleged, in the same pleading, that the loan documents were signed both before and after April 17. *Compare* Resp't's Opp'n to Pet. for Cert. 3 *with id.* at 4; *compare* Br. of Resp't 4 *with id.* at 4–5.

The trial court seems to have gotten caught up in the confusion during its exceptions hearing. The judge stated:

> Well, Counsel, as I said I did review the file, and I see, I notice a foreclosure was filed in July of 2009. [T]hat was filed along with the deed of trust, which was dated 4/17/07 and then the note and then the addendum to notes. . . .
> [I]n December I see that [Capps's counsel] . . . filed a third party complaint . . . against EquiFirst Corporation, Wells Fargo, and . . . the allegations were that the, Mr. Capp [sic] had rescinded. Apparently, there's no dispute about that. [T]hat he signed the note, and then within the period of time—he was given the proper notice for a rescission, within the period of time . . . he did rescind.

Capps came close to alleging explicitly that the loan documents were signed *before* April 17 in his brief to this Court. Br. of the Resp't 6 ("[I]n this case, Respondent signed the loan documents, and *then* he sent the notice of rescission in a timely manner." (emphasis added)). In his First Amended Third Party Complaint, which was dismissed ultimately, *see infra* note 13, Capps alleged that he told a Wells Fargo representative that "he had tried to rescind the loan immediately after he had signed the loan papers and that EquiFirst had improperly not allowed him to rescind. He told the Wells Fargo

(Continued…)

4

settlement date on the financing statement was April 24,[6] and the loan proceeds (net of charges, costs, and fees) were disbursed on April 25, in satisfaction of the pre-existing mortgage ($292,061.86) and Capps's credit card debts ($32,045), with an additional $5,878.31 to the borrower directly.

On April 15 or 16,[7] 2007, Capps attempted to rescind a loan by faxing to EquiFirst a form titled "Notice of Right to Cancel"[8] referring solely to a property address of 2909 Loch Haven Court, Ijamsville, MD, 21754.[9] In the subject line on the fax cover sheet of

---

(… Continued)
representative that he wanted to rescind, and Wells Fargo refused to allow rescission." This pleading was not made under oath or affirmation and was not supported by affidavit. He did not reiterate this allegation subsequently under oath or affidavit. Paradoxically, Capps has never alleged that the loan documents were misdated.

The confusion was perpetuated at oral argument before us. The attorney for Capps suggested repeatedly that Capps signed the Deed of Trust and Note—and then was provided with the precompleted Notice of Right to Cancel forms—*before* he faxed the Notice, which would have been necessarily before April 17, the date on the documents. (Counsel responded to the question: "So, under your theory, after he—he signs this Notice of Rescission at closing?" with "No, he signed it afterwards.") When asked how counsel's theory could be compatible with the April 17 date, counsel referred simply to an email chain between EquiFirst and Endeavor Mortgage employees. *See infra* note 10.

[6] *See supra* note 5.

[7] Capps's signature on the Notice of Right to Cancel was dated April 16. The transmission verification report on the fax of the same to EquiFirst reflects that it was sent on April 15, at 9:19 pm. Again, this could be explained as another example of time travel or an exercise in post-dating.

[8] Called the "Notice of Right to Cancel," this form was designed by the lender to satisfy the requirements of 12 C.F.R. § 226.15(b) (describing the required features of a notice of right to rescind).

[9] The typed date on the heading of the form is April 2. The body of the document instructed Capps that he had a legal right to cancel the transaction within three business

(Continued…)

5

this form, Capps stated "I wish to exercise this Right[.] Please see attached form." This document was received by EquiFirst.[10] Capps alleges that at some point after he sent the fax, someone from EquiFirst "told [him] that this rescission was not effective, that [he] could not rescind, and that the mortgage would remain in effect." Capps did not identify

---

(… Continued)

days of the date of the transaction. The date of the purported transaction, printed within the body of the document, was April 2. This typed iteration of the transaction date was crossed out, with "11[th]" handwritten on the document in its place. The notice goes on to instruct Capps that he must send the notice by mail or telegram no later than midnight on April 5, although this date was crossed out also, with "16[th]" handwritten in its place. In a footnote in his brief to this Court, Capps suggests, for the first time, that the Notice of Right to Cancel should have reflected a third set of dates entirely, although he fails to say what they should have been. ("In practice, a borrower does not receive the three day rescission forms until closing on a loan. Therefore, Respondent could not have rescinded until after closing, and the notice was misdated."). His only support for this theory is that "[t]he lender admitted in an email to having timely received the notice." This reliance was misplaced. *See infra* note 10.

It was suggested by the Trustees in their brief to us that this Notice may have been left over from the first or second refinance offer and perhaps Capps submitted this Notice before going through with the third mortgage offered to him, in an attempt to ensure that he was working on a clean slate with the third offer. This is supposition, as the record is silent as to the actual origin of this particular document. The record also does not contain any information as to whether Capps was provided with a new Notice of Right to Cancel on April 17 or at any point thereafter. Regardless, it is not material to the disposition of this case precisely when Capps received the form or who altered it.

[10] Capps makes much of a subsequent email chain between EquiFirst and Endeavor Mortgage employees, suggesting that the email chain shows that the rescission notice was received timely. On April 17 at 7:54 am, one email correspondent informed several others that "FYI, this file was cancelled due to the borrower signing the right to cancel. It will now be forwarded to the Charlotte office." Another correspondent responded by noting that something, presumably their interactions with Capps, were "a waist of our time.. [sic]" This email chain does not show, however, that the lender acknowledged the rescission as timely; rather, it acknowledges simply that a Notice of Right to Cancel had been signed and received by them. The initial email was sent before normal business hours on April 17, leaving plenty of time for Capps to sign the loan documents later in the day.

6

which EquiFirst employee made such statements, nor did he substantiate from any other source that the conversation occurred. He alleged further that he "believed what EquiFirst told [him]" and therefore began making payments on the loan. In 2009, Capps lost his job and became unable to make his monthly mortgage payments.

PROCEDURAL HISTORY

On 30 September 2009, Petitioners (the Substitute Trustees,[11] or "Trustees") filed in the Circuit Court for Frederick County an Order to Docket Foreclosure, thereby commencing an action to foreclose under the deed of trust. On 30 December 2009, Capps filed a Motion to Stay or Dismiss the foreclosure proceeding, in which he argued that he had rescinded the loan, pursuant to 15 U.S.C. § 1635, by faxing a "Notice of Right to Cancel" to EquiFirst.[12] Also on 30 December 2009, Capps filed in the foreclosure action a third-party complaint against EquiFirst and Wells Fargo, again arguing that he rescinded timely and validly the loan and also that EquiFirst violated TILA by refusing to recognize his rescission. Wells Fargo filed a Motion to Dismiss the Third-Party Complaint, arguing that, whatever the merits, Capps's claim fell beyond the applicable statute of limitations and further that he waived his claims by accepting the benefits of

---

[11] At some point, EquiFirst transferred the note to SABR Mortgage Loan 2008-1 REO Subsidiary-1, LLC ("SABR"). The record does not suggest when this transfer occurred. SABR is a securitized trust administered by Wells Fargo Bank, N.A. ("Wells Fargo"). On 1 September, 2009, SABR appointed John S. Burson, et al., as Substitute Trustees.

[12] This Motion was denied on 5 January 2010, without elaboration, by the trial court.

7

the transaction. Wells Fargo's motion was granted ultimately on 2 May 2011.[13] On 7 December 2011, the note holder purchased the home for $275,000 at a foreclosure public auction. A Report of Sale was filed on 5 January 2012.

Capps filed on 23 February 2012 Exceptions to the Foreclosure Sale, where he argued again that he had rescinded the loan. The Substitute Trustees reiterated their position that Capps's TILA claim was barred by the applicable statute of limitations, that they had standing to foreclose, and further that Capps did not raise any allegations which, if true, could result in the sale being rescinded. The exceptions were overruled at a hearing on 3 April 2012,[14] and the sale was ratified on 5 April 2012. That same day, the

---

[13] Wells Fargo first filed a Motion to Dismiss Third-Party Complaint on 15 November 2010, which the Circuit Court granted on 10 March 2011 with leave to amend. Capps filed his First Amended Third-Party Complaint on 25 March 2011. Wells Fargo responded with a Motion to Dismiss Amended Third-Party Complaint on 7 April 2011. This motion was granted on 2 May 2011.

[14] The trial court's explanation for the denial was:

> I find this case presents some very interesting issues, and I can understand the Defendants raising them again. Although, I think they were properly raised prior to sale, and ruled upon. So, . . . Defendant disagrees with the ruling, so I think from that he may have an appeal.
>
> As to the particular point where we are, really there is no allegations [sic] as to the validity or irregularity of the sale as it went forward specifically, . . . that would require the sale to be rescinded, . . . because all of the allegations that are made are really as to the validity of the note of first, no note, then the deed of trust gets cancelled, et cetera, et cetera, et cetera. There's nothing upon which to foreclose.
>
> And these arguments are not simple, but I do believe that they have been argued by both of you in your briefs prior to trial, and nothing really new has been raised. So, at this

(Continued…)

court entered an Order of Ratification of Sale. Capps appealed to the Court of Special Appeals.

In an unreported opinion, the Court of Special Appeals reversed the Circuit Court, addressing the question of whether the loan had been rescinded "lawfully."[15] The Court of Special Appeals reasoned that TILA's overarching purpose was to "protect consumers in a rather difficult and complicated process." Because there was no language in § 1635 or Regulation Z—TILA's implementing regulation—*prohibiting* a borrower from rescinding a loan prior to the consummation of the transaction, the Court of Special Appeals reasoned that such an action, when viewed in a light favoring the interests of borrowers, was supported by the statute.[16] Otherwise, reasoned the intermediate appellate court, the rights of borrowers to protect themselves would be restricted severely, contrary to Congress' stated goals in TILA. The three judge panel of our appellate colleagues explained that the three-day window for rescissions did not open at closing and then shut at midnight three business days later, but rather the window

---

(… Continued)

> point, . . . [Capps's Counsel], I'm going to deny your motion
> to strike exceptions [sic].

[15] In considering the question, the Court of Special Appeals addressed issues of timeliness and modality of the purported rescission. Based on the manner in which this case was litigated and the questions presented to us on appeal, *see infra*, we decide here solely the issue of timeliness, which is dispositive of this case.

[16] The intermediate appellate court stated: "Based on our reading of 15 U.S.C. § 1601 and Regulation Z, as well as case law, we perceive no such prohibition [on exercising the right to rescind prior to a loan's consummation]. In fact, there is nothing in either regulation specifically prohibiting such conduct."

remained open throughout the negotiation process for a loan commitment leading up to closing and lapsed at the end of three days after closing. The intermediate appellate court remanded the case to the Circuit Court to (1) determine whether it is possible for all parties to return to the *status quo ante*, (2) use its equitable powers to restore Capps's credit rating should he be able to return the proceeds of the loan, and (3) determine whether EquiFirst violated TILA by ignoring intentionally Capps's rescission notice.[17]

We granted the Trustees' Petition for Writ of Certiorari. 435 Md. 501, 79 A.3d 947 (2013). The Trustees posed the following three questions in their petition:

1. Whether a TILA Notice of Rescission can be effective to cancel a loan transaction that has not yet taken place, and remain effective despite the issuing party's subsequent acceptance of the benefits of the transaction?

2. Whether a TILA action filed in December 2009 on the basis of a Notice of Rescission issued in April 2007 was untimely as beyond the one-year statute of limitation in 15 U.S.C. § 1640(e)?

3. Whether rescission is an available remedy when the trial court has no jurisdiction over either the original lender or its assignee because all claims against both have been dismissed, with no appeal taken from that dismissal?

Because of our answer to the first question, we do not reach the others.

Before us, the Trustees argue that Capps could not have rescinded the loan at a point in time when he had not yet signed the deed of trust, note, and other loan

---

[17] The Court of Special Appeals remanded the case to the Circuit Court to make a final determination as to whether the contract between Capps and EquiFirst was rescinded properly, but, based on its discussions of the issues presented to it, the intermediate appellate court seemed convinced that the loan was rescinded timely and through the proper channels.

documents. He may have gone through the motion of submitting a Notice of Right to Cancel, but he did so prematurely—namely, before he consummated the transaction. If he had wanted actually to avoid the obligations of the loan, the Trustees argue, he should not have signed the note and deed of trust, nor should he have accepted the net loan proceeds and authorized the lender to pay off the existing mortgage and his other creditors. Capps, for his part, echoes the reasoning of the Court of Special Appeals, and further argues that the Notice of Right to Cancel, regardless of when it was sent, operated to cancel the transaction, and that the funds never should have been disbursed.[18]

---

[18] In his brief to, and at oral argument before, this Court, Capps makes three additional arguments, none of which is properly before this Court. First, he suggests that the lender violated 12 C.F.R. § 226.15(c) by disbursing funds before the three-day rescission waiting period expired. Chronological inconsistencies aside, *see supra* note 5, Wells Fargo's Motion to Dismiss Capps's third party complaint alleging TILA violations was granted and no cross-appeal was taken. Even had that judgment been appealed properly, the third party complaint did not allege a violation of 12 C.F.R. § 226.15(c)'s three-day funds-dispersal waiting period rule.

Second, Capps argues in his brief to this Court that EquiFirst committed fraudulent conduct when it told him that his rescission was not effective and that he was still bound by the Note and its terms. Accordingly, the Note and Deed of Trust are not enforceable. Third, at oral argument, Capps's attorney suggested that the Trustees violated the Maryland Rules by not serving him with a Report of Sale, instead sending the document only to Capps. Neither of these two questions were preserved properly for appeal.

The concurring and dissenting opinion implies that Capps's allegation of fraudulent conduct might still be a live question. *See* Concurring and Dissenting slip op. at pp. 3–4, 5–6. Capps did not file, however, a cross-petition for a writ of certiorari as to that question. *See* Maryland Rules 8-131(b). Even if that issue were properly before this Court, Capps failed to argue the question with particularity in that he failed to cite even a single case or authority relevant to the question in his brief either to us or the intermediate appellate court. "[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal." *Klauenberg v. State*, 355 Md. 528, 552, 735 A.2d 1061, 1074 (1999) (refusing to consider an argument when one statement to that effect was "lumped in" with another argument); *Mathis v. Hargrove*, 166 Md. App. 286, 318,

(Continued…)

11

Before a foreclosure sale takes place, "the defaulting borrower may file a motion to 'stay the sale of the property and dismiss the foreclosure action.'" *Bates v. Cohn*, 417 Md. 309, 319, 9 A.3d 846, 852 (2010) (quoting Md. Rule 14-211(a)(1)).  In other words, the borrower may "petition the court for injunctive relief, challenging 'the validity of the lien or . . . the right of the [lender] to foreclose in the pending action.'" *Bates*, 417 Md. at 319–20, 9 A.3d at 852 (quoting Md. Rule 14-211(a)(3)(B)).  In *Svrcek v. Rosenberg*, the Court of Special Appeals explained the appropriate standard of review on appeal from a denial of a Motion to Dismiss or Stay sought pursuant to Maryland Rule 14-211: "'The grant or denial of injunctive relief in a property foreclosure action lies generally within the sound discretion of the trial court.'  Accordingly, we review the circuit court's denial of a foreclosure injunction for an abuse of discretion.  We review the trial court's legal conclusions *de novo*."  203 Md. App. 705, 720, 40 A.3d 494, 503 (2012) (quoting

(… Continued)
888 A.2d 377, 396 (2005) (refusing to review one argument on appeal because no authority for the position was cited); *Pool v. State*, 207 Md. App. 614, 633, 53 A.3d 479, 491 (2012) (refusing to consider an argument when it was made in one sentence, in a footnote, with no supporting argument).  The full extent of his argument to this Court on the question of fraudulent conduct attributable to the Substitute Trustees is as follows: "[I]nstead of honoring Respondent's request, the lender told him that his request was legally not effective and that he was bound by the Note and its terms.  This was both a violation of TILA and fraudulent conduct, and, as a result, the Note and Deed of Trust are not enforceable."  The point was argued similarly in his brief to the Court of Special Appeals as well.  This is plainly insufficient under our appellate Rules and case law. Further, certiorari was not granted as to either question.  We decline to consider them. *See* 8504(a)(3), (5); *Comptroller of Treas. v. Aerial Prods., Inc.*, 210 Md. 627, 644, 124 A.2d 805, 814 (1956).

*Anderson v. Burson*, 424 Md. 232, 243, 35 A.3d 452, 459 (2011) and citing *Wincopia*

*Farm, LP v. Goozman*, 188 Md. App. 519, 528, 982 A.2d 868, 873 (2009)).

When ruling on exceptions to a foreclosure sale:

> [T]rial courts may consider both questions of fact and law. In reviewing a trial court's finding of fact, we do "not substitute our judgment for that of the lower court unless it was clearly erroneous" and give due consideration to the trial court's "opportunity to observe the demeanor of the witnesses, to judge their credibility and to pass upon the weight to be given their testimony." *Young v. Young*, 37 Md. App. 211, 220, 376 A.2d 1151, 1157 (1977). Questions of law decided by the trial court are subject to a *de novo* standard of review.

*Jones v. Rosenberg*, 178 Md. App. 54, 68, 940 A.2d 1109, 1117 (2008) (citations

omitted). Once a foreclosure sale has been ratified:

> The ratification of a foreclosure sale is, however, presumed to be valid. *Webster v. Archer*, 176 Md. 245, 253, 4 A.2d 434, 437–38 (1939). It is settled law that, "there is a presumption that the sale was fairly made, and that the antecedent proceedings, if regular on the face of the record, were adequate and proper, and the burden is upon one attacking the sale to prove the contrary." *Id.* The party excepting to the sale bears the burden of showing that the sale was invalid, and must show that any claimed errors caused prejudice. *Ten Hills Co. v. Ten Hills Corp.*, 176 Md. 444, 449, 5 A.2d 830, 832 (1939). Additionally, "[i]n reviewing a court's ratification of a foreclosure sale, we will disturb the circuit court's findings of fact only when they are clearly erroneous." *Fagnani*, 190 Md. App. at 470, 988 A.2d at 1138 (relying on *Jones v. Rosenberg*, 178 Md. App. 54, 68–69, 940 A.2d 1109 (2008)).

*Fagnani v. Fisher*, 418 Md. 371, 384, 15 A.3d 282, 290 (2011).

13

The right of rescission dispute joined in this case derives from that right as granted in the federal Truth in Lending Act ("TILA"). TILA was designed to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . . ." 15 U.S.C. § 1601(a) (2012). TILA requires creditors "to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998); *see McOmie-Gray v. Bank of Am. Home Loans*, 667 F.3d 1325, 1327 (9th Cir. 2012) ("TILA protects consumers from fraud, deception, and abuse within the residential secured lending marketplace by mandating that lenders disclose certain information to borrowers.").

When interpreting TILA and its implementing regulations, federal and Maryland principles of statutory construction agree that we begin with its text. "'The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written.'" *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012) (quoting *Textron, Inc. v. Comm'r*, 336 F.3d 26, 31 (1st Cir. 2003). By the same token, "'absent some obvious repugnance to the statute, the . . . regulation implementing [TILA] should be accepted by the courts." *Textron, Inc.*, 336 F.3d at 277 (quoting *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981)). Our goal in interpreting TILA, as with any legislation, is "to ascertain and

14

implement the legislative intent, which is to be derived, if possible, from the language of the statute (or Rule) itself. If the language is clear and unambiguous, our search for legislative intent ends and we apply the language as written in a commonsense manner." *Downes v. Downes*, 388 Md. 561, 571, 880 A.2d 343, 349 (2005). We "presume that [a] legislature says in a statute what it means and means in a statute what it says there." *Turner v. Knight*, 406 Md. 167, 175, 957 A.2d 984, 988 (2008) (internal quotations omitted). The interpretation of a word or phrase "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Turner*, 406 Md. at 175, 957 A.2d at 989 (internal quotations omitted).

TILA grants homeowners a right to rescission in certain circumstances:

> Except as otherwise provided in this section, *in the case of any consumer credit transaction* (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, *the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction* or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Bureau [of Consumer Financial Protection], of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Bureau, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Bureau, appropriate forms for the obligor to

15

exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a) (emphasis added). *See* 12 C.F.R. § 226.15(a)(3) (2013) ("*The consumer may exercise the right to rescind until midnight of the third business day following the occurrence described in paragraph (a)(1) of this section that gave rise to the right of rescission*, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last." (emphasis added)). This three-day rescission window is a cooling-off period within which the borrower may rescind with no questions asked. The lender may not disburse the funds until those three days have passed (unless the borrower waives the right to rescind). 12 C.F.R. § 226.15(c). In the event that the lender fails to comply with the statutory disclosures, the right to rescind is extended to three years after closing. 15 U.S.C. § 1635(f); 12 C.F.R. § 226.15(a)(3).

Regulation Z, TILA's implementing regulation, describes how the right to rescind is to be exercised:

> To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram, or other means of written communication. Notice is considered given when mailed, or when filed for telegraphic transmission, or, if sent by other means, when delivered to the creditor's designated place of business.

12 C.F.R. § 226.15(a)(2).

Once the right to rescission has been exercised timely and properly, the borrower is "not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such

16

a rescission." 15 U.S.C. § 1635(b); *see* 12 C.F.R. § 226.15(d)(1) ("When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void, and the consumer shall not be liable for any amount, including any finance charge."). Upon receipt of a notice of rescission, "the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction." 15 U.S.C. § 1635(b).

Capps bows, as he must, to what the statute provides as to when the three-day window for rescission shuts—at midnight three business days after closing, or, if the notice was delivered after closing, three days after that later date. We must decide here when that window sash is flung open.

TILA does not define the term "rescission." Regulation Z provides that, when a term is not defined, "the words used have the meanings given to them by state law or contract." 12 C.F.R. § 226.2(b)(3). The Court of Special Appeals had occasion to consider the definition of "rescission" in *Maslow v. Vanguri,* where the intermediate appellate court sought to determine the point at which a breach of contract became material enough to warrant rescission under Maryland common law. 168 Md. App. 298, 323–24, 896 A.2d 408, 423 (2006). The court adopted the definition of rescission in an earlier iteration of *Black's Law Dictionary*:

> Rescission of Contract. To avoid, or cancel a contract; particularly, nullifying a contract by the act of a party . . . . To declare a contract void in its inception and to put an end to it as if it never were . . . . A 'rescission' amounts to the unmaking of a contract, or an undoing of it from the

17

> beginning . . . . It necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it.

168 Md. App. at 323, 896 A.2d at 423 (quoting *Black's Law Dictionary* 1306–07 (6th ed. 1990)).[19] Other courts have looked to *Black's Law Dictionary*, as well as *Webster's Third New International Dictionary*, for definitions of the term:

> While neither the Act nor the implementing regulations define the term, common definitions of "rescission" indicate that it covers more than simply removing a security interest created through a loan. According to [*Black's Law Dictionary*], the term means "[a] party's unilateral unmaking of a contract," which "restores the parties to their precontractual positions." According to [*Webster's Third New International Dictionary*], the term means "an act of cutting off" or "an act of rescinding, annulling, or vacating or of cancelling or abrogating (as by restoring to another party to a contract or transaction what one has received from him)."

*See Barrett v. JP Morgan Chase Bank, N.A.*, 445 F.3d 874, 879 (6th Cir. 2006) (citations omitted). For present purposes, we understand the term "rescission" in TILA to mean "to cancel" or "to undo."

The right of rescission belongs to borrowers only "in the case of any consumer credit transaction." 15 U.S.C. § 1635(a). In those cases, the borrower may rescind until midnight of the third business day "following the consummation of the transaction." *Id.* § 1635(a). Regulation Z defines "consummation" as "the time that a consumer becomes

---

[19] The current iteration of *Black's Law Dictionary* defines rescission as follows: "1. A party's unilateral unmaking of a contract for a legally sufficient reason . . . ." Rescission, *Black's Law Dictionary* 1420–21 (9th ed. 2009).

18

contractually obligated on a credit transaction."[20] 12 C.F.R. § 226.2(a)(13). TILA does not define the phrase "consumer credit transaction," nor the term "transaction." The word "transaction," however, is included as part of two other defined terms, each of which presupposes that the "transaction" must be consummated. *See Weintraub v. Quicken Loans, Inc.*, 594 F.3d 270, 273 (4th Cir. 2010). TILA's definitional section defines "residential mortgage *transaction*" as "a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest *is created or retained* against the consumer's dwelling to finance the acquisition or initial construction of such dwelling." 15 U.S.C. § 1602(x) (emphasis added). Similarly, a "reverse mortgage *transaction*," also defined in § 1602, is "a nonrecourse transaction in which a mortgage, deed of trust, or equivalent consensual security interest *is created* against the consumer's principal dwelling . . . ." *Id.* § 1602(cc) (emphasis added). Both definitions treat the word "transaction" as a consummated event, "indicating that any credit transaction under § 1635(a) must be consummated for the right to rescind to attach." *Weintraub*, 594 F.3d at 275.

---

[20] When a consumer "becomes contractually obligated on a credit transaction" is, in turn, determined by looking to state law: "*State law governs.* When a contractual obligation on the consumer's part is created is a matter to be determined under applicable law; Regulation Z does not make this determination." 12 C.F.R. Pt. 226, Supp. I, p. 612 (Official Staff Commentary). As the case was presented here, neither party alleged that the consummation date was some date in the negotiation process other than the date that the Adjustable Rate Note and Deed of Trust were signed and dated. Accordingly, for present purposes, the consummation date in this case was April 17. We decline to opine on the definition of the word "consummation" and whether other events might qualify as "becom[ing] contractually obligated."

Regulation Z presumes that, at the time a borrower wishes to exercise his or her rescission right, there is something to rescind. It notes that the effect of rescission is to render void "the security interest giving rise to the right of rescission." 12 C.F.R. § 226.15(d)(1). There must be a security interest in being to rescind in order for it to be rendered void. *See* 12 C.F.R. Pt. 226, Supp. I, pp. 709–10 (Official Staff Commentary) ("In order for the right of rescission to apply, the security interest must be retained as part of the credit transaction."); 12 C.F.R. Pt. 226, Supp. I, p. 712 (Official Staff Commentary) ("Any security interest giving rise to the right of rescission becomes void when the consumer exercises the right of rescission. The security interest is automatically negated, regardless of its status and whether or not it was recorded or perfected."). In our view, "consummation of the transaction" refers to closing, or, the moment when the note and deed of trust or mortgage are signed. Until a loan is consummated, there is no consumer credit transaction, and the consumer has no obligations from which he or she would need a right of rescission. If the loan was not consummated yet, the borrower could decline simply to sign the loan documents and avoid liability. Under TILA, a borrower cannot rescind that which has not occurred yet.[21]

_____

[21] We need not grapple with, in the abstract, whether TILA's right of rescission mirrors, enlarges, or diminishes existing Maryland common law on rescission because the outcome is the same under either. Under Maryland common law, "if a party who knows the facts would justify rescission, does any act which recognizes the continued validity of the contract or indicates that he still feels bound under it, he will be held to have waived his right to rescind." *Lazorcak v. Feuerstein*, 273 Md. 69, 76, 327 A.2d 477, 481 (1974). It is undisputed that, approximately a week and a half after submitting a Notice of Right to Cancel, Capps accepted not only sufficient funds to pay off his prior mortgage (almost

(Continued…)

20

In the case at bar, Capps could not have rescinded what he had not yet created. On the 15th of April, when he faxed a Notice of Right to Cancel, the arguably rescindable transaction had not come into being yet, and therefore could not be cancelled then. Capps consummated the transaction on Tuesday, April 17, when he signed the loan documents. April 17, then, is the earliest that the three-day window could have opened.[22] If Capps wanted to avoid the loan, he should not have signed the loan documents, or he should have caused the proceeds to be returned promptly.

The United States Court of Appeals for the Fourth Circuit shares our view of § 1635. In *Weintraub v. Quicken Loans, Inc.*, 594 F.3d 270 (4th Cir. 2010), the Fourth Circuit considered whether the TILA right to rescind applies in cases where the transaction had not closed yet. The borrowers in that case argued, like Capps, that the text of § 1635(a) does not require that a loan be consummated before the right to rescind may arise, but rather that rescission is possible any time after the parties begin negotiations for a potential extension of credit. *Weintraub*, 594 F.3d at 273–74. The Fourth Circuit held that "no 'consumer credit transaction' exists for which the right to rescind can be exercised until that transaction has been consummated, or put another way, until credit is in fact extended." *Weintraub*, 594 F.3d at 275 (internal quotations omitted).

---

(… Continued)
$300,000), but also more than $32,000 to pay off credit card debts and $5,878.31 in his pocket. In addition, he made monthly payments on the loan until 2009.

[22] In the event that Capps was provided with a Notice of Right to Cancel after April 17, the three-day window would have opened at that time. *See* 15 U.S.C. § 1635(a).

In support of its decision, the Fourth Circuit looked to TILA disclosure cases in the context of automobile loans for the proposition that TILA liability under the analogous § 1638 does not attach until after the consummation of a consumer credit transaction. *Weintraub*, 594 F.3d at 274–75 (examining *Nigh v. Koons Buick Pontiac GMC, Inc.*, 319 F.3d 119 (4th Cir. 2003), *rev'd on other grounds*, 543 U.S. 50 (2004), and *Baxter v. Sparks Oldsmobile, Inc.*, 579 F.2d 863 (4th Cir. 1978)). In *Baxter*, the Fourth Circuit held that there was no consumer credit transaction to which TILA would apply when the consumer cancelled the transaction before it was consummated. *Baxter*, 579 F.2d at 864. In *Nigh*, although the transaction had not been consummated formally (i.e., the credit had not yet been extended), the Fourth Circuit held that *Baxter* was satisfied once the consumer became obligated contractually on the credit transaction. *Nigh*, 319 F.3d at 123–24.

The Fourth Circuit relied also on "a commonsense reading of the text of § 1635(a)" in holding that the term transaction "refers to a consummated, binding agreement, rather than to the whole course of the parties' interactions. The right to rescind a transaction defined as the whole course of interactions between the parties would essentially be meaningless—there would often be nothing to rescind." *Weintraub*, 594 F.3d at 276.

We could find little else on point across the country. In an unreported opinion[23] from 2002, a federal district court in Illinois held similarly that the TILA remedy of rescission was not available to homeowners before closing. In *Sampanetti v. E\*Trade Mortgage Corp.*, No. 02-C-3513, 2002 WL 31478269 (N.D. Ill. Nov. 5, 2002), the homeowners signed a "Lock-In Agreement" which provided that their $400 interest-rate lock-in fee was only refundable in the event that E\*Trade did not approve the loan for closing. *Sampanetti*, 2002 WL at \*1. The homeowners alleged that this was in violation of their statutory right to rescind under TILA. E\*Trade argued that that right was not available yet as the parties had not closed. *Sampanetti*, 2002 WL at \*1–\*2. Because TILA and Regulation Z "do not clearly indicate that the concept of rescission, or the language requiring a refund upon rescission, applies to a situation where a loan has not yet closed," the court concluded that "holding that the rescission and refund provisions apply to such a situation would constitute an impermissible expansion of the statute and the regulations." *Sampanetti*, 2002 WL at \*2.

We are aware of only one additional opinion that speaks to the question of whether, under TILA, a loan may be rescinded before it is consummated. In 1997, a City Court for Mt. Vernon, New York (a trial court-equivalent), held in *Community Mutual Savings Bank v. Gillen*, 655 N.Y.S.2d 271 (N.Y. City Ct. 1997), that consumers have a right to rescind even when they do not close on the loan. *Cmty Mut. Sav. Bank*, 655

---

[23] We do not include this case for any precedential or persuasive value here. The Fourth Circuit's opinion in *Weintraub* serves as persuasion enough. *Sampanetti* is recounted merely to illustrate the paucity of opinions nationally—especially from high courts—as to the question before us.

23

N.Y.S.2d at 273. In that case, the borrowers applied for a loan and received a firm commitment letter, which scheduled closing for 12 July 1996. *Cmty Mut. Sav. Bank*, 655 N.Y.S.2d at 272. Due to a dispute over real property taxes, the borrowers did not sign the loan documents at the closing table. *Id.* Nonetheless, the representatives of the lender gave the rescission notice to the borrowers and asked that they sign it immediately, which they did. *Cmty Mut. Sav. Bank*, 655 N.Y.S.2d at 274. The City Court reasoned that, because the notice of rescission itself did not say that the loan needed to be consummated before it could be used, and because the lender gave the notice to the borrowers and instructed them to sign it, the lender "must be bound by its own notice of rescission." *Id.* From the court's perspective, "the consummation merely provides a frame of reference from which the time for rescission may be calculated." *Cmty Mut. Sav. Bank*, 655 N.Y.S.2d at 273. Further, the City Court reasoned that, as rescission is an equitable doctrine, "[n]othing in TILA or Regulation Z limits a Court of Equity from preventing an inequitable or improper result from the exercise of the statutory rescission." *Cmty Mut. Sav. Bank*, 655 N.Y.S.2d at 274. To the extent that the City Court reasoned that, under TILA, a contract need not be formed before it may be rescinded, we are unpersuaded and disagree accordingly. *See Cmty Mut. Sav. Bank*, 655 N.Y.S.2d at 273 (indicating, in dicta, that "[a]ccording to the plain language of the statute and regulation, there is no requirement that the transaction be consummated").

In the present case, the Court of Special Appeals relied on another Fourth Circuit case, *Gilbert v. Residential Funding LLC*, 678 F.3d 271 (4th Cir. 2012), in holding that Capps did what a borrower is supposed to do to rescind a loan. In *Gilbert*, the Fourth

24

Circuit considered what actions by borrowers were sufficient to exercise the right of rescission. There, the borrowers notified the lender by letter, within three years of the execution of the note, that they were rescinding their mortgage transaction. *Gilbert*, 678 F.3d at 274–75. The Fourth Circuit considered whether a borrower must file a lawsuit within three years after the consummation of a loan transaction, or whether he or she may assert the right simply through a written notice. *Gilbert*, 678 F.3d at 276. Based on the plain meaning of the statute, the court concluded that 15 U.S.C. § 1635 "does not require borrowers to file a claim for the invocation of that right." *Gilbert*, 678 F.3d at 278. Although *Gilbert* is instructive as to the appropriate demonstrative methodologies by which a borrower may rescind a loan, it has little to contribute on the subject of *when* a borrower may rescind under TILA. At most, *Gilbert* suggests that Capps may have chosen a proper method when he employed a form Notice of Right to Cancel; however, he deployed it prematurely.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT CAPPS.**

Judge Watts joins the judgment only.

25

Circuit Court for Frederick County
Case No. 10-C-09-003783
Argued:  September 9, 2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 2

September Term 2014

JOHN S. BURSON, ET AL.

v.

JEFFREY G. CAPPS

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts

JJ.

Concurring and Dissenting Opinion by
McDonald, J., which Adkins, J., joins

Filed: October 23, 2014

The Majority opinion holds that a borrower's right to rescind a loan transaction under the federal Truth in Lending Act does not extend to a transaction that has yet to occur. I have no quarrel with that legal proposition, but it is not at all clear that it applies to this case. The Majority opinion essentially engages in its own fact-finding in an effort to apply that holding and to resolve this case. But that is not our role. I would remand this matter to the Circuit Court for further factual development in the appropriate forum.

The Majority opinion makes heroic efforts, largely in footnotes,[1] to construct a factual basis for its decision. But, as the Majority opinion recognizes, the current record of this case is quite murky with respect to the sequence of events involving Mr. Capps, the mortgage broker, and the lender. The Majority opinion attributes this state of the record solely to Mr. Capps. Majority slip op. at pp. 3-5 & n.5. However, while Mr. Capps provided a sworn affidavit and e-mails between the loan broker and lender[2] on the question of rescission in the Circuit Court, the substitute trustees never disputed the timeliness of the rescission notice in the Circuit Court and, perhaps for that reason, did nothing themselves to clarify the record

---

[1]Majority slip op. at pp. 3-5 n.5, pp. 5-6 nn.9-10.

[2]Those e-mails documented that the loan broker and lender received the rescission notice. While the representative of the loan broker expressed disappointment that the transaction had fallen through ("what a waist" [sic]), none of the parties in the e-mail string suggests that the rescission was premature. The Majority opinion puts its own gloss on these e-mails, asserting that because some of the e-mails are dated on the morning of April 17, there was "plenty of time for Capps to sign the loan documents later in the day." Majority slip op. at p. 6 n.10. Whether some unknown event occurred on April 17 that resulted in a transaction taking place subsequent to the e-mails – contrary to Mr. Capps' assertion – is pure speculation by the Majority opinion. The substitute trustees offered no evidence in the Circuit Court on that point.

on the relevant time line.[3] Nonetheless, the Majority opinion faults Mr. Capps alone for failing to clarify the time line of the loan transaction and rescission.

In the Circuit Court, the substitute trustees relied on a host of other legal arguments, but not the one on which the Majority opinion decides this case. Indeed, the substitute trustees did not suggest that Mr. Capps' rescission of the transaction was premature until this case reached the Court of Special Appeals. In its unreported opinion, the intermediate appellate court held that a rescission notice is effective under the Truth in Lending Act, even if it is sent before the consummation of a transaction. Thus, resolution of the time line in Mr. Capps' case was not essential to that court's decision. That court apparently accepted the substitute trustees' belated assertion that the rescission notice pre-dated the transaction and held that, under its view of the rescission right, that timing did not matter.

In this Court, the substitute trustees challenge the timeliness of the rescission notice based on typewritten and handwritten dates that appear on various documents, although they offered no evidence in the Circuit Court as to the accuracy of any particular date. The Majority appears to accept the idea that the typewritten and handwritten dates on various documents may not be the dates on which the particular documents were actually executed. Majority slip op. at pp. 5-6 nn.7, 9. Nevertheless, it generally draws inferences in favor of the substitute trustees and against Mr. Capps as to the accuracy of particular dates.

---

[3] In opposing Mr. Capps' exceptions to the foreclosure sale in the Circuit Court, the substitute trustees themselves did not argue that the rescission notice was premature. Record Excerpts at 82-91.

2

In the oral argument before us, the substitute trustees conceded that a borrower receives the form to rescind a loan only at the closing – a fact that suggests that the borrower (Mr. Capps) could only have submitted the rescission form – however the documents may have been dated or mis-dated – *after* the closing. The Majority opinion dismisses this information as to when a borrower receives a rescission form in relation to a closing as "not material" to the question of when this borrower would have been able to submit the rescission form related to the loan transaction in this case. Majority slip op. at pp. 5-6 n.9. But the Majority opinion can only speculate as to how Mr. Capps would have come into possession of the rescission form prior to the closing.

Mr. Capps asserted in the Circuit Court that he had rescinded the transaction in a timely manner, but that the lender had told him – incorrectly – that the rescission was ineffective, that he was bound by the promissory note he had signed, and that he was obligated to accept the funds and make payments. It is not inconceivable that a mortgage broker or a lender, who stands to lose a substantial fee if a transaction does not go forward, would discourage a borrower from rescinding a transaction.[4] The Majority opinion discounts Mr. Capps' affidavit, although it is unrebutted in this record, and faults Mr. Capps for not elaborating on the circumstances of the rescission by filing an additional affidavit. Majority

---

[4]The record discloses that, in Mr. Capps' transaction, the loan broker and lender received fees totaling more than $13,000 upon closing of the transaction. Record Excerpts at 41.

3

slip op. at pp. 3-5 n.5. The substitute trustees introduced no evidence – in the form of sworn affidavits or otherwise – on this issue in the Circuit Court.

As the Majority opinion notes, at the hearing on exceptions in the Circuit Court, the judge summarized the history of the case as to the rescission issue – without any contradiction or objection by counsel for the substitute trustees – as follows:

> ... the allegations [in a third party complaint against the lender] were that Mr. Capps had rescinded. Apparently, there's no dispute about that. [T]hat he signed the note, and then rescinded within the period of time – he was given proper notice for a rescission, within the period of time, ... he did rescind.
>
> [A]pparently there's little dispute about the fact that, ... when he spoke to the lender he was told he couldn't ... rescind and he then began making payments on the loan, which apparently he made until he lost his job.

Record Excerpts at 109-10. The Majority opinion dismisses the trial judge's statement as the result of "confusion." Majority slip op. at p. 4 n.5.

At times, it appears that it is the Majority opinion that is confused or that simply disregards parts of the record. For example, the Majority opinion relies heavily on the undisputed facts that Mr. Capps accepted the proceeds of the loan and made payments on it until he lost his job. Majority slip op. at p. 3 n.4, 11, 20-21 n.21.[5] While it notes that Mr. Capps recounted in his affidavit that he did so because the lender had told him that his rescission was ineffective and that the mortgage would remain in effect, it gives no weight

---

[5]These are two of the six facts it deems material to the disposition of this case. Majority slip op. at p. 3 n.4.

to that undisputed fact,[6] stating that "Capps *did not identify* which Equifirst employee made such statements, *nor did he substantiate* from any other source that the conversation occurred." Majority slip op. at pp. 6-7 (emphasis added). Apparently, the Majority opinion would prefer to have more evidence on the circumstances of this conversation, as might a fact-finder at trial. But the substitute trustees never challenged Mr. Capps' statement that this conversation occurred.

The Majority opinion disregards Mr. Capps' factual allegations by noting that the order granting a writ of certiorari did not address fraud. This is not surprising, as the Court of Special Appeals did not rely on the allegedly fraudulent statements by the lender in issuing its decision and remanding the case to the Circuit Court.[7] The Majority opinion does not

---

[6]Indeed, in arguing that Mr. Capps waived his right of rescission, Majority slip op. at pp. 20-21 n.21, the Majority either ignores these facts or is very forgiving as to the lender's alleged misconduct, which would constitute a violation of the Truth in Lending Act.

[7]The record before us reveals that Mr. Capps has consistently asserted that he went through with the loan and made payments because he was told by the lender that he could not rescind the loan. This allegation of fraud on the part of the lender, supported by a sworn affidavit and never rebutted by the substitute trustees, was part of his initial motion to stay and dismiss the foreclosure action and was reiterated in the post-sale exceptions and considered by the Circuit Court. Although that court alluded to the possibility of a fraud exception to the limitations of Rule 14-305, *see Bates v. Cohn*, 417 Md. 309, 324 n.10, 9 A.3d 846 (2010), it ultimately did not address the effect of the rescission or the lender's alleged statement, as the court held that the issue did not concern "the validity or irregularity of the [foreclosure] sale." *See* Record Excerpts at 43, 78, 111-12. Thus, the Circuit Court did not make any fact findings as to whether the alleged statements were made or whether Mr. Capps accepted the loan and made payments in reliance on those statements. In ruling in Mr. Capps' favor, the Court of Special Appeals did not address the fraud question and remanded the case for a determination whether Mr. Capps had in fact rescinded the transaction.

5

explain why Mr. Capps should have filed a conditional petition for certiorari on an issue that was not decided against him in the intermediate appellate court and that would remain part of the case on remand to the Circuit Court. In any event, we should not disregard sworn factual information in the record simply to make the remaining facts fit our disposition of the case.

In sum, in concluding that Mr. Capps' rescission was premature, the Majority is making a decision that is premature. Now that the question of the timing of the rescission has been raised, further proceedings in the Circuit Court would clarify what documents were post-dated or pre-dated, whether Mr. Capps was purposely vague or the substitute trustees were purposely silent, and whether there is other evidence of when the closing took place in relation to the rescission notice. It may be that the Majority's speculation as to the facts of this case would ultimately prove accurate and that Mr. Capps' rescission notice would be held ineffective or that the lender had not misled him and he had waived the rescission. But the trial court is the appropriate forum for determining the dispositive facts. Pursuant to Maryland Rule 8-604(d),[8] I would remand without affirming or reversing for further factual development.

Judge Adkins has advised that she joins this opinion.

---

[8]That rule provides, in pertinent part, that "[i]f the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court...."

6