*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CV-249

RICHARD C. BARTEL, APPELLANT,

v.

BANK OF AMERICA CORPORATION, APPELLEE.

FILED 09/13/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-5798-13)

(Hon. John M. Campbell, Motion Judge)

(Argued February 27, 2018    Decided September 13, 2018)

*Matthew August LeFande* for appellant.

*David M. Ross* for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and BECKWITH, *Associate Judges*.

BECKWITH, *Associate Judge*:  More than twenty years ago, appellant Richard Bartel purchased a cashier's check for $30,761.00, made payable to "Dana McKinley or Edna McKinley or Richard Bartel," and left the check in the McKinleys' safe with the hope that it would serve as consideration for a business

transaction that never came to fruition. When Mr. Bartel sought to recover the check over a decade later, it had vanished from the safe, both of the McKinleys had died, and neither Mr. Bartel nor the issuing bank had any record of where the check might have gone. Mr. Bartel filed suit against appellee Bank of America Corporation to enforce his claim for the value of the missing check.

This is Mr. Bartel's second appeal from the trial court's grant of summary judgment to Bank of America. On remand after the first appeal, the trial court granted summary judgment again, finding that Mr. Bartel's claims were barred by laches, that he failed to satisfy two separate statutes governing the enforcement of a lost or stolen cashier's check, and that his sworn declaration of loss was insufficient. Mr. Bartel challenges each of the trial court's findings. We conclude that because Mr. Bartel "transferred" the cashier's check when he made it payable to the McKinleys and then left it in their possession, he is now precluded from enforcing his statutory claim for the missing instrument.

**I.**

In the trial court, the parties alleged the following during discovery and in support of their summary judgment filings. In 1994, Richard Bartel purchased a cashier's check in the amount of $30,761.00 from Bank of America's predecessor in interest, NationsBank of Maryland, N.A. The check was payable to "Dana

McKinley or Edna McKinley or Richard Bartel." The bank issued the check to Mr. Bartel and shortly after, according to Mr. Bartel, he and Dana McKinley placed the check in the McKinleys' safe. Mr. Bartel intended the check to serve as consideration for a contemplated business transaction with the McKinleys. Specifically, Mr. Bartel hoped that the McKinleys would sell their shares of a company of which Mr. Bartel was a majority shareholder—though he had "no specific reason to believe they would do so." After the McKinleys declined to consummate the hoped-for business transaction, Mr. Bartel left the check with Dana McKinley anyway on the chance that they would come to an agreement later.

Mr. Bartel has not seen the check since he left it with the McKinleys in 1994. At some point, he reached out to the McKinleys to inquire about the check. According to Mr. Bartel, Dana McKinley informed him that he had not "touched or moved the check" but that he had "seen it on multiple occasions." Mr. McKinley added, however, that "he could not open the safe because he had fumbled a change in the safe combination, or alternatively, that his [g]uardian had changed the combination." Mr. McKinley's guardian was appointed in 2008 because Mr. McKinley was suffering from a deteriorating mental illness. Mr. McKinley's mother Edna McKinley died that same year, at which point she was "blind, over eighty years of age[,] and immobile." Although Mr. Bartel alleges that Mr. McKinley told him that he never moved the check, there is no indication in the

record that Edna McKinley made any equivalent representation. Mr. Bartel stated in a 2008 email that Rene McKinley, who was Dana McKinley's sister and Edna's daughter, had access to the safe at one point after receiving the combination from a family friend.

In 2009, Mr. Bartel filed an action in Florida, where the McKinleys had lived, to obtain possession of the check. When the safe was eventually drilled open, the check was not found inside. Mr. Bartel later learned, from an inventory of Dana's and Edna's estates, that there was no record of a deposit into either of their accounts other than ordinary pension deposits. Mr. Bartel asked Bank of America to run a search for records relating to the check. A representative of the bank responded that there was no record of escheatment to the State of Maryland (where the check was issued) and no record of the check as unclaimed property in Maryland.

Mr. Bartel submitted what he titled a "declaration of loss" of the check to Bank of America in 2013, requesting payment. In that declaration, he asserted that no payment of the check had ever occurred and that the original instrument had been lost. He attached a photocopy of the original check, emblazoned with the words "copy—not negotiable." The bank replied that it could not honor his demand for payment. The bank explained that, in conformance with federal law, it

maintained records for seven years and was at that point—nineteen years from the date of issuance—unable to locate any information related to the check.

Shortly after, Mr. Bartel filed a complaint against Bank of America for relief under D.C. Code §§ 28:3-309 and -312 (2015 Supp.)—two statutes that establish the procedures by which a party can obtain payment of a lost cashier's check or other negotiable instrument.[1] The trial court granted summary judgment to Bank of America.

On appeal, this court held that the trial court had erred by assigning Mr. Bartel the burden to establish that the check had not already been paid to someone entitled to enforce it. *Bartel v. Bank of America*, 128 A.3d 1043, 1047 (D.C. 2015). We specifically declined to address, however, "whether Mr. Bartel bore the burden of proving that the McKinleys had not negotiated the check, i.e., transferred possession of the check to a holder." *Id.* at 1045 n.1. We also left open "whether dismissal or summary judgment would be appropriate on other grounds not reached by the trial court, including laches as well as other statutory requirements under sections 28:3-309 and 28:3-312." *Id.* Finally, we clarified that we did not decide "whether, given that the Bank bears the burden on the issue of prior

---

[1] Mr. Bartel also alleged unjust enrichment but the trial court dismissed that ground for failure to state a claim and Mr. Bartel has not challenged that ruling on appeal.

payment, the Bank [could] nevertheless [] demonstrate an entitlement to summary judgment on that issue." *Id.*

On remand, the parties again filed motions for summary judgment. The trial court once again granted summary judgment for Bank of America, this time on three independent grounds. The court first found that Bank of America's equitable defense of laches applied because Mr. Bartel had "failed to exercise reasonable diligence in protecting his rights" by waiting nineteen years to seek payment from the bank. The court also granted summary judgment because Mr. Bartel had failed to satisfy the statutory requirements for enforcement of a lost, destroyed, or stolen instrument (D.C. Code § 28:3-309) or cashier's check (D.C. Code § 28:3-312). Finally, the court found that Mr. Bartel had failed to comply with the statute setting forth the requirements for filing a declaration of a lost check (D.C. Code § 28:3-312 (a)(3)). Mr. Bartel challenges each of these findings.[2]

**II.**

"To prevail on a motion for summary judgment, a party 'must demonstrate that there is no genuine issue of material fact and that [it] is entitled to judgment as

---

[2] Given our resolution of Mr. Bartel's challenge to the trial court's conclusion that he failed to satisfy the requirements set forth in D.C. Code § 28:3-309 and § 28:3-312, we need not reach the remaining issues.

a matter of law.'" *Boyrie v. E & G Prop. Servs.*, 58 A.3d 475, 477 (D.C. 2013) (quoting *Murphy v. Schwankhaus,* 924 A.2d 988, 991 (D.C. 2007)). We review orders granting summary judgment de novo, "applying the same standard as the trial court did in ruling on the motion." *Washington v. District of Columbia*, 137 A.3d 170, 173 (D.C. 2016). In doing so, we construe the record in the light most favorable to the party opposing summary judgment. *Perkins v. District of Columbia*, 146 A.3d 80, 84 (D.C. 2016).

Two provisions in Article 3 of the Uniform Commercial Code (UCC)—which has been adopted in the District of Columbia[3]—set forth requirements for enforcing a cashier's check that has been lost: D.C. Code § 28:3-312 (Repl. 2012)[4] (entitled "Lost, destroyed, or stolen cashier's check, teller's check, or certified check") and § 28:3-309 (entitled "Enforcement of a lost, destroyed, or stolen instrument"). Section 28:3-312 (a)(3) imposes an obligation on a bank that issues a cashier's check to refund a lost check to a claimant who files, under penalty of perjury, a declaration that says that the declarer lost possession of the check and that the loss of possession was not the result of a transfer. Section 28:3-309

---

[3] *See Dennis Joplin Co., LLC v. Robinson Broadcasting Corp.*, 977 F. Supp. 491, 494 (D.D.C. 1997).

[4] Unless otherwise noted, all subsequent citations to the D.C. Code are from the 2012 replacement volume.

similarly states that the loss of possession cannot be the result of a "transfer."[5] "An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." D.C. Code § 28:3-203 (a).

In this case, Mr. Bartel purchased a cashier's check and chose to have it made payable to Dana McKinley, Edna McKinley, or himself. He then placed the check in the McKinleys' safe and left it there. The trial court found, and Bank of America emphasizes on appeal, that the moment that Mr. Bartel voluntarily left the check made out to both McKinleys in their possession, he transferred the instrument to them. Mr. Bartel's primary response is that although he did give the McKinleys the check, he did not do so "for the purpose" of giving them the right to enforce the instrument. Rather, he gave them the check for safekeeping. For him to have "transferred" the check, Mr. Bartel argues, the McKinleys would have needed the lawful right to enforce the check—which he says they never had

---

[5] Each section serves a slightly different purpose. Section 28:3-309 applies only to a person entitled to enforce a check, but "does not apply to a remitter of a cashier's check or teller's check or to the drawer of a certified check." D.C. Code § 28:3-312 UCC comment 1. Section 28:3-312 applies to both the person entitled to enforce a check and to those excluded under § 28:3-309, *id.*, and is designed to provide a person who loses a check the means of getting a refund without posting a bond. *Id.* Depending on the circumstances, a person might be able to enforce a claim for a missing instrument under either section.

because he gave them the check only in contemplation of a future negotiation.

As named payees on the cashier's check, both of the McKinleys were entitled to enforce the instrument once they had possession. D.C. Code § 28:3-110 (d) ("If an instrument is payable to 2 or more persons alternatively, it is payable to any of them and may be negotiated, discharged, or enforced by any or all of them in possession of the instrument.").[6] Mr. Bartel made the check payable to the McKinleys and placed it in their safe—and took these steps so that the McKinleys could, upon selling their shares, enforce the check with the issuing bank. The UCC draws a distinction between the right to enforce an instrument and the ownership of an instrument. As stated in D.C. Code § 28:3-301, "[a] person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument," and not all owners will qualify as persons entitled to enforce. The two are different concepts. D.C. Code § 28:3-203 UCC comment 1. "Although transfer of an instrument might mean in a particular case that title to the instrument passes to the transferee, that result does

---

[6] *Cf. In re Mora*, 218 B.R. 71, 76 (9th Cir. 1998) (explaining why a transfer of a cashier's check, as opposed to a regular check, occurs when the check is in the physical possession or control of the intended payee, under a different provision of the federal bankruptcy code); *In re Essex Constr., LLC*, 575 B.R. 648, 657 (D. Md. 2017) ("a cashier's check is transferred upon delivery, because the obligation to pay a cashier's check becomes fixed at that point") (citation omitted).

not follow in all cases." *Id.*; *see also Brown v. Wash. State Dep't of Commerce*, 359 P.3d 771, 777–78 (Wash. 2015) (discussing the two sets of rights embraced by promissory notes under the UCC); David Frisch, 6B Lawrence's Anderson on the Uniform Commercial Code § 3-203:4 (3d ed. rev.) ("A transfer does not require that the transferor intend to vest ownership in the instrument of the transferee."). So even if Mr. Bartel intended that the McKinleys' permanent possession of the funds be contingent upon their sale of stock, when he delivered the check to the McKinleys, he did so for the purpose of conferring the right to enforce the instrument.[7] *See Anderson v. Burson*, 35 A.3d 452, 461 (Md. Ct. App. 2011) ("[T]he transferor . . . must intend to vest in the transferee the right to enforce the instrument (thieves and accidental transferees are excluded) and must deliver the instrument so the transferee receives actual or constructive possession."); *see also* D.C. Code § 28:3-203 UCC comment 1 (providing as an example that a transferee may have a purpose "other than transfer of the right to enforce" where a "check is presented for payment by delivering the check to the drawee . . . because there is no intent to give the drawee the right to enforce the check").

As the trial court stated, § 3-203's definition of a transfer does not include

---

[7] In that same vein, had the McKinleys enforced the check but maintained the entire sum in cash in the same safe pending their sale of stock to Mr. Bartel, it is not clear that this would have been a violation of their alleged contract with him.

language limiting the right to enforce a check to an "immediate right" or to a "right not contingent on other events." The statute's unqualified language is consistent with the burdens of proof allocated throughout Article 3 of the UCC, designed to make it unnecessary for a bank to have to "delve into the contractual relationships of named payees[.]" *Am. Nat'l Ins. Co. v. Citibank*, 543 F.3d 907, 909–10 (7th Cir. 2008) (explaining that it would "bring commercial transactions to a grinding halt" if, "instead of being able to look at the payee line and to verify that the person presenting the check was indeed entitled to do so, banks" were required "to conduct a full-blown investigation every time to make sure that a party with an equitable interest in the check was not lurking in the background"); § 28:3-203 UCC comment 1 ("An instrument is a reified right to payment. The right is represented by the instrument itself."); *see also Menichini v. Grant*, 995 F.2d 1224, 1232 (3d Cir. 1993) ("Article 3 of the UCC furnishes us with the applicable loss-allocation rules for the check payments. These rules, premised on the responsibility to exercise ordinary care, proceed from the principle that liability rests with the party best able to prevent the loss."). From the standpoint of the bank, the McKinleys had a legal right to enforce the check without providing any notice to Mr. Bartel. D.C. Code § 28:3-110; *see also* D.C. Code § 28:3-412 ("The obligation" on the part of the issuer of a cashier's check "is owed to a person entitled to enforce the instrument."); *Covington v. JP Morgan Chase*, 62 F. Supp.

3d 47, 55–56 (D.D.C 2014) (citing D.C. Code § 28:3-203 (b)).

That Mr. Bartel transferred the check does not mean that a person in Mr. Bartel's shoes is necessarily without recourse. Where a third party breaches a contract or improperly converts an instrument, a person in Mr. Bartel's circumstances may pursue an action against that third party. *See* § 28:3-203 UCC comment 1 ("If [a] thief transfers [a] check to a purchaser the transferee obtains the right to enforce the check. If the purchaser is not a holder in due course, the owner's claim to the check may be asserted against the purchaser."); *cf. McNulty v. Great Am. Ins. Co.*, 727 F. Supp. 45, 48–49 (D. Mass. 1989) ("Although the plaintiff in this case is a payee and was unaware of the attempted surrender of the note, the actors who returned the old check and received a new check were payees also. . . . A note should not be considered 'lost' solely because it has been transferred improperly."). Mr. Bartel's private hope or even formal agreement requiring that the McKinleys not cash the check until selling their stock shares did not, however, immunize his delivery of a cashier's check made out to both of them from the repercussions of such a transfer within the meaning of § 28:3-203.[8] In

---

[8] This result may seem unusually harsh in light of the unique circumstances of Mr. Bartel's case, where both of the McKinleys are now deceased and the lapse of time has resulted in a scenario in which, as the trial court put it, "[t]here are simply no records proving anything" as to the whereabouts of the check, "except that Mr. Bartel has a copy of a 1994 receipt for the check." In a different case, the

(continued…)

short, therefore, Mr. Bartel cannot prevail in his suit because his "loss of possession" was "the result of a transfer" precluding his recovery under D.C. Code § 28:3-309 (a)(2) and § 28:3-312 (a)(3)(iii).

## III.

For the foregoing reasons, we affirm the judgment of the Superior Court.

*So ordered.*

---

(…continued)
McKinleys might have been able to simply describe what had come of the check or file a declaration of loss themselves. Given the facts at hand, however, we interpret "transfer" consistent with the primary concern associated with a missing instrument—that the bank not be forced to pay twice, *e.g. A.I. Credit Corp. v. Gohres*, 299 F. Supp. 2d 1156, 1160 (D. Nev. 2004)—and consistent with the fundamental "principle that liability rests with the party best able to prevent the loss." *Menichini v. Grant*, 995 F.2d 1224, 1232 (3d Cir. 1993). Having voluntarily given the McKinleys a cashier's check that they could readily enforce or negotiate at any time, Mr. Bartel is no longer in the best position to attest to the fate of the missing instrument.